6 So.2d 880
## ROYAL INS. CO., Ltd., v. ROBERTSON.
### 7 Div. 674.

Supreme Court of Alabama.

March 12, 1942.

Coleman, Spain, Stewart & Davies, of Birmingham, for appellant.

C. W. Stringer, of Talladega, for appellee.

THOMAS, Justice.

The suit was upon a policy of fire insurance issued on what is known as a dwelling and household furniture form.

The evidence showed that on the 20th day of December, 1939, the Royal Insurance Company issued a policy of fire insurance for the term of one year in the amount of $2,500 to the plaintiff, covering household furniture items contained in a building described as being occupied by the assured as a dwelling house.

After the fire occurred, the adjuster for the Royal Insurance Company, Mr. E. M. Cole, came to Sylacauga, the scene of the fire, and the plaintiff and his wife called off the articles which were located in the house and which were alleged to have been destroyed by the fire; also the articles which they admitted were saved therefrom. A written agreement as to the value, loss and damage was then entered into by Robertson and the Royal Insurance Company by the adjuster, whereby it was agreed that the value of the property belonging to Robertson and described in the policy was $1,813.65, and that the loss and damage of said property was $1,378.70; that the amount of the property saved and undamaged from the fire was of the value of $434.95. This nonwaiver agreement was dated the 8th day of February, 1940. Subsequent thereto, plaintiff filed a proof of loss with defendant in which he claimed that the amount of the property which was totally destroyed by the fire amounted to $1,-813.65, and attached to said proof of loss a list of said property which plaintiff had given to Mr. Cole, which was supposed to have contained all of the property, damaged or undamaged, which was described in the policy. This proof of loss appears in the record.

The difference between the claim and the proof of loss and the agreement as to sound value and loss of damages is clear. This amounted to the sum of $434.-95, the amount of the salvaged articles, and the difference between the value of the property described in the policy and the property that was lost or damaged.

The fire occurred in the early morning of January 14th, 1940, which was Sunday. The plaintiff had a wife and four children; had sent his wife and three of the children to Alexandria, in Calhoun County, Alabama, his former home, and one child to Birmingham. His family did not intend to return until he had moved to their new home on a State farm near Sylacauga, where he had rented a house and was planning to move from the building in which the insured property was then located. When his family left town, he got drunk, and claims that on that Saturday he was in his house drunk. During that time a negro employee, by the name of Sam Mitchell, was with him. During the afternoon he went to his laundry which he was operating in Sylacauga. He testified that he was planning to move to his new house, that his family did not intend to return until he had moved. The assured admits that he was drunk, and says he did not know what he was doing on that Saturday night, January 13, 1940.

The evidence shows that during said night, the plaintiff and Sam Mitchell ransacked the house and moved such articles as one trunk, radio, silverware, cooking utensils, children's toys, school books, and wearing apparel, which were contained in three barrels and laundry hampers. Such articles are before this court for inspection. Employees of his laundry testified that these articles were not in the laundry when they quit work on Saturday night and were in the laundry Sunday morning when they were discovered by the firemen and police officers. Photographs were taken of these articles and are exhibited in the record before us.

On the morning of January 14th, 1940, plaintiff with his negro Sam Mitchell who had been with him, and who had immediately theretofore been buying liquor for him, was seen to enter the rear of the house (in which Robertson had been living) by two police officers, who were patrolling their beats. They were Mr. Holmes and Mr. Carden. Holmes testified in substance that while making his official rounds at about 2:30 A. M. on January 14, 1940, he saw an automobile drive into the rear of the house which had been occupied by Mr. Robertson and family; that he turned the lights of his automobile on the car and saw that it was Robertson and his negro boy Sam Mitchell; that he then proceeded on to the business section of Sylacauga, parked his car, walked into the street, saw a light, immediately went back and discovered that it was Robertson's house on fire; that this was about fifteen or twenty minutes after he had seen Robertson and Sam Mitchell enter that house. He then put in the fire alarm and later went to the laundry and found Mr. Robertson asleep on a table. This officer asked Robertson where his family were and he told him that his son was in his house. The officer returned to the house and made a search but was unable to find the boy. The search in the burning building for the boy was made with the fireman, Mr. Looney. Holmes returned to the laundry and told Mr. Robertson that his boy was not at the house, but he does not remember what Robertson said in reply. That witness stated that Robertson was not drunk but was drinking "pretty heavy." The same officer discovered the three barrels and contents (before this court by certificate thereto) and other articles in the hampers in Robertson's laundry on Sunday morning. Mitchell told Mr. Thomas, the State Fire Marshal, and Mr. Craven, the deputy, that Robertson set the fire in the back hall of the house where some magazines and papers were, and that during that action he (Sam Mitchell) stood on the running board of the car and kept the motor running. The same statement was made to Mr. Gilbert, a fireman of the City of Sylacauga. He testified as follows:

"As to what Sam said about how the fire started, he said he and Mr. Robertson were together; he drove the car up to the house and Mr. Robertson got out and went in the house and poured some papers out in the floor and set it afire."

The evidence shows that the fire started at the point indicated; that a hole was burned in the floor in the back of the house.

The evidence further shows that Robertson had been seen in his laundry on two occasions before the fire. Of this Mr. Holmes testified that he saw him first at about 10:30 and later about 12:30.

The next morning after the fire, the plaintiff undertook to conceal the articles that were in the laundry and which had been moved by the negro Sam Mitchell and Robertson on Saturday night from the house. An employee of the laundry testified that she tied up the silverware in a bag and gave it to a negro by the name of Flora Griffith on the orders of Robertson. This silverware was placed in a boiler and Flora Griffith was told to take it immediately to her home, although it was early in the morning. Flora Griffith testified that she did this, and that the officers came "to her house and took these articles from her * * *." She did not wait until the end of her day's work, but was told to take it home immediately and return to the laundry, which she did. Mr. Robertson also instructed Mary Baker to wash all of his clothes, even though they were clean. Some of the glassware was placed in the coal bin and was found by one of the negro employees who gave it to Mary Baker with coal dust on it. The feather pillows had been put in the wash wheel by some one other than the employees.

The evidence further shows that when the firemen went to the Robertson house, it was observed that the house was completely ransacked; the bed clothing was off the beds; there was nothing in the closets nor in the dresser drawers; the movable articles such as wearing apparel, silverware, trunk, radio, childrens' toys and other articles had been moved out of the house.

Policeman Holmes testified to this briefly, as follows: "I did go through the house and see what was in there. No, sir, there wasn't any clothes in there except a few table linens and things in a covered place in the kitchen. We looked in there and there was some linens and things in sort of a built-in cabinet, in the room next to the kitchen. Yes, sir, they were empty. Yes, sir, I did look in that closet (indicating on diagram). No sir, I did not see any clothes in the closets; a few clothes hangers. Yes, sir, a few hangers. No clothes. To my best recollection, there were three beds in the house, and they all had mattresses and springs on them, but that was all except one bed and it had a blanket on it; the rest of them didn't have a thing in the world except a mattress on them."

On the trial of the case, the plaintiff brought into court certain articles which he claimed were saved but they were not among the articles shown by the photographs. When asked about these matters Robertson stated that he was so drunk that he does not know what occurred. His evidence is, as follows:

"As to whether I was drunk; I was a little out, yes, sir. As to how long I had been drinking some two or three days; As to how long I had been out; well, I don't know. * * *

"As to whether I told him I was so drunk I didn't know what I was doing; I don't know about that. As to whether I was so drunk I don't know whether I was at the house at two o'clock; well, I couldn't possibly have been down there without somebody had carried me. As to whether it is a fact that I was so drunk I didn't know where I was; well, I didn't know much. Yes, sir, that is what I have already testified to. As to whether I was so drunk I didn't know whether it was eight o'clock or two o'clock; well, I was full, that is all I know."

He further testified that he was so drunk the next morning that he asked Sam Mitchell to drive him to Alexandria; that he was so drunk he could not indicate to the negro the direction in which to go; that they got lost and had to return to Sylacauga and then start out again. Robertson did not go to the scene of the fire until Monday morning.

Mr. E. M. Cole, the adjuster, testified in substance that Robertson told him that he did not know where he was on the night of the fire because he was so drunk; that he did not know how the fire started and that he did not know whether he set it or not.

Robertson also told Lennard Thomas, the deputy state fire marshal, that he was so drunk that he did not know how the fire started and that he did not remember anything about the night the fire happened. Robertson also told Thomas that he carried a load of quilts between 8 and 9 o'clock from his house to the laundry.

■. It is established in this jurisdiction that if the verdict is wrong and unjust and contrary to the great weight and preponderance of the evidence, it should be set aside. Southern Home Ins. Co. v. Boatwright, 234 Ala. 668, 176 So. 460; Jena Lumber Company v. Marlowe Lum-

ber Co., 208 Ala. 385, 94 So. 492; Pollard v. Rogers, 234 Ala. 92, 173 So. 881; Franklin Fire Ins. Company v. Slaton, 240 Ala. 560, 200 So. 564.

█ This court has declared that drunkenness voluntarily produced does not excuse or palliate the offense committed by the drunken person. King v. State, 90 Ala. 612, 618, 8 So. 856; Ivory v. State, 237 Ala. 344, 186 So. 460.

█ Was a prima facie conspiracy shown to exist between Robertson and Sam Mitchell to burn the insured property and defraud the insurance company? The extent and duration of a conspiracy are necessarily dependent upon the facts in each case. Our recent cases on conspiracy are collected in several decisions of this court. Louisville & N. R. Co. v. National Park Bank, 188 Ala. 109, 65 So. 1003; Clark v. State, 240 Ala. 65, 197 So. 23.

In Jack v. Mutual Reserve Fund Life Ass'n, 5 Cir., 113 F. 49, 57, it was observed: " * * * It is urged here that there was error in receiving this evidence, because, if a conspiracy had been established to kill Charles T. Stewart, the same had been accomplished, and that no declarations or conduct of Lipscomb could be admissible in evidence against Guy Jack after the accomplishment of the conspiracy. The fallacy of this position is that the conspiracy did not have for its aim and end the killing of Stewart. The purpose of the conspiracy was to get the insurance on his life. If this could have been accomplished without Stewart's death, he probably would not have been poisoned. His death was an incident, but not the end, of the conspiracy. If, after his death, part of the insurance money had been collected, and divided between Jack and Lipscomb, can any one doubt that such evidence would have been admissible as tending to show the conspiracy and its purpose? The court did not err, we think, in admitting proof of the conduct of Lipscomb, after the death of Stewart. Holt v. State [39 Tex.Cr.R. 282], 46 S.W. 829; State v. Byers [16 Mont. 565], 41 P. 708."

In National Ben Franklin Fire Ins. Co. v. Stuckey, 5 Cir., 79 F.2d 631, 634, the court held: "The proffered testimony of Jess Cannington tended to prove that McCloud, shown by previously admitted evidence to have been a coconspirator with appellee, sought by what he said to the witness to further the object of the conspiracy by inducing the witness to join in the enterprise and to 'keep his mouth shut and quit talking so damn much.' That testimony was not rendered inadmissible by the fact that the conversation asked about occurred after the fire. The burning of the building and its contents was not the object of the conspiracy. The object of the conspiracy was to defraud the insurer by enabling the insured to assert and maintain a grossly excessive claim of loss or damage caused by the fire. The burning of the building and its contents was an incident of the conspiracy, not its end or object. The proffered evidence tended to prove conduct of a coconspirator in furtherance of the conspiracy, the object of which had not been consummated when the incident inquired about occurred. Jack v. Mutual Reserve Fund Life Ass'n [5 Cir.], 113 F. 49, 57; International Indemnity Co. v. Lehman [7 Cir.], 28 F.2d 1, certiorari denied 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 561."

In International Indemnity Co. v. Lehman et al., 7 Cir., 28 F.2d 1, 4, the court said: "The rule we deduce from these cases is that an admission of one conspirator, if made during the life of the conspiracy, is admissible against a joint conspirator, when it relevantly relates to and is 'in furtherance of the conspiracy.' Construing the expression 'in furtherance of the conspiracy' reference is not to the admission as such, but rather to the act concerning which the admission is made; that is to say, if the act or declaration, concerning which the admission or declaration is made, be in furtherance of the conspiracy, then it may be said that the admission is in furtherance of the conspiracy."

The long prevailing rule in this jurisdiction, as stated in Hunter v. State, 112 Ala. 77, 21 So. 65, is as follows: "In a criminal case, the acts and declarations of another person than defendant, in the absence of the defendant, are admissible in evidence against the defendant, when there has been introduced evidence, direct or circumstantial, prima facie sufficient to establish the existence of a conspiracy between the defendant and such other person to commit the offense charged, and such acts and declarations are in furtherance of the common design to commit the crime."

In 3 Greenl. on Evidence, § 94, the rule is said to be that, "The principle upon

which such declarations are admitted is that the conspirators, by the act of conspiring, 'have jointly assumed to themselves the attribute of individuality, so far as regards the prosecution of the common design, thus rendering whatever is said or done by any one in furtherance of that design, a part of the res gestae, and therefore the act of all.'"

Of this observation in Cox v. State, 240 Ala. 368, 199 So. 806, 807, the court said: "* * * 'It is necessary, before such evidence can be admitted, that a foundation should be laid by proof, addressed to the court, prima facie sufficient to establish the existence of such a conspiracy. McAnally v. State, 74 Ala. 9. But such evidence will generally, from the nature of the case, be circumstantial. 3 Greenl. Ev. § 96.' Hunter v. State, 112 Ala. 77, 21 So. 65, 66; Patterson et al. v. State, 202 Ala. 65, 79 So. 459; 22 C.J.S., Criminal Law, § 760, page 1300."

And a like application of this well-considered rule as to admissions made by a coconspirator is discussed in Clark v. State, 240 Ala. 65, 197 So. 23; Morris v. State, 25 Ala.App. 494, 149 So. 359.

The trial court permitted the plaintiff-appellee, over the objection of the defendant-appellant, to introduce declarations made to Mr. Welch and others tending to contradict Mitchell's alleged statements made to other officers and given on the trial over objection of plaintiff to the general effect that the house was burned by Robertson and Mitchell. Such contradictory evidence offered by plaintiff was admitted without error under the rule that obtains in this jurisdiction, that a party cannot complain of admission of illegal evidence in rebuttal of illegal evidence introduced by him. Winslow v. State, 92 Ala. 78, 9 So. 728; Morgan v. State, 88 Ala. 223, 6 So. 761; Lewis v. Martin, 210 Ala. 401, 98 So. 635; Miller et al. v. Whittington, 202 Ala. 406, 80 So 499.

The whole record having been carefully examined, under the rules that obtain [Cobb v. Malone, 92 Ala. 630, 9 So. 738; Nashville, Chattanooga & St. Louis Ry. v. Crosby, 194 Ala. 338, 70 So. 7], the motion for a new trial should have been granted at the instance of defendant Royal Insurance Company Limited, a Corp., and for this error, the judgment of

the circuit court is reversed, and the cause remanded.

Reversed and remanded.

GARDNER, C. J., BROWN, and LIVINGSTON, JJ., concur.