112 So.2d 776

**J. H. SIMS**

v.

**Alston CALLAHAN.**

**6 Div. 290.**

Supreme Court of Alabama.

May 21, 1959.

Whitmire, Morton & Coleman, Birmingham, for appellant.

Spain, Gillon & Young, Cabaniss & Johnston, Ralph B. Tate, Foster Etheridge and Leigh M. Clark, Birmingham, for appellee.

STAKELY, Justice.

This is an appeal by the plaintiff from the verdict and judgment rendered in the case of J. H. Sims, Plaintiff, v. Dr. Alston Callahan, Defendant. The case was submitted to the jury on Count A, which claims damages sustained by the plaintiff as the result of fraud and deceit of the defendant. The defendant pleaded in short by consent the general issue as to Count A. At the conclusion of the trial there was a verdict in favor of the defendant and thereupon the judgment was rendered by the court for the defendant and against the plaintiff. There was a motion for a new trial, which was overruled by the court. This appeal followed.

In Count A, upon which the case was tried and submitted to the jury, the plaintiff avers in substance the following: On July 25, 1955, while the relationship of patient and physician existed between the plaintiff and the defendant, a specialist engaged in the treatment, care and surgery of the eye, "defendant did willfully and falsely represent to plaintiff, with the intent to injure plaintiff, that plaintiff should undergo immediate surgery to remove cataracts and other growth from his eyes, else run the risk of blindness or great loss of vision, which said representation was false, and the falsity of said representation was unknown to the plaintiff; that said representation was made by defendant to induce plaintiff to undergo said surgery as a patient of defendant in order that defendant might collect from plaintiff a fee for performing said surgery and the plaintiff in reliance upon said representation, and believing the same to be true, but which was untrue, and known by defendant to be untrue, consented and agreed to allow defendant to perform surgery on plaintiff's eyes to remove said cataracts and other growth from his eyes. * * *

" * * * And plaintiff in reliance upon said representation of defendant and believing the same to be true did, * * * enter the Jefferson-Hillman Hospital, in the City of Birmingham, Jefferson County, Alabama, on, to-wit, July 30, 1955, and became a patient therein of defendant for the purpose of having defendant perform said surgery upon plaintiff's eyes; that plaintiff, after entering said hospital on, to-wit, said date, and while being made ready to undergo said surgery, by the nurses and other personnel, of said hospital, learned that said representation of the defendant was false. That the plaintiff upon learning that said representation of the defendant was false left said hospital before defendant performed said surgery and returned to his home.

"And plaintiff avers that said representation of defendant was false, in that plaintiff did not need to undergo said surgery or run the risk of blindness or great loss of vision; that to the contrary had plaintiff undergone said surgery he would have sustained substantial loss of vision all to his. great loss and damage.

"And the plaintiff avers that he in reliance upon said representation of defendant and believing the same to be true, but which was untrue * * *," sustained the injuries and damages set forth in his complaint.

This appeal presents three principal questions:

The first is the admission in evidence, over the objection of counsel for plaintiff, of testimonials in behalf of defendant by a series of witnesses called to the witness. stand by defendant, who claimed to have been former patients of defendant, upon whom, so the witnesses were allowed to testify, the defendant had performed cataract surgery with results most satisfactory to said witnesses.

The second is the ruling of the trial court in sustaining the objection of counsel for defendant to the introduction in evidence of a certified copy of the record of the United States of America, Plaintiff, v. Alston Callahan, Defendant. In that record the defendant Dr. Alston Callahan pleaded guilty to the criminal act de-

nounced by U. S. C. A., Title 18, Section 1461, of depositing for mailing and delivery by the post office department of the United States a package containing obscene, lewd, lascivious, and filthy pictures or color film, a further description of which, so the information alleges, is too obscene, lewd, lascivious, and filthy to be spread upon the records of the court.

The third is the action of the trial court in giving and reading to the jury a series of charges, requested in writing by defendant, in which the jury was instructed, in substance, that if Dr. Callahan "honestly" stated to plaintiff the condition of plaintiff's eyes, as Dr. Callahan "believed" the same to exist, the plaintiff cannot recover, and in charging the jury in other charges requested by defendant that the jury could not return a verdict for plaintiff, unless the jury was reasonably satisfied from the evidence that Dr. Callahan "knew" that his representations to plaintiff were "false," and that the representations were made to plaintiff with the "deliberate" intent to "deceive" plaintiff.

The appeal also presents for review other rulings of the court below in the admission and rejection of other evidence and the order of the trial court sustaining the demurrer of defendant to Count Two and Count B of plaintiff's complaint.

Tendencies of the evidence showed in substance the following: The plaintiff, a retired workman, who on the date of the trial of this case was seventy-eight years old, became a patient of defendant, Dr. Alston Callahan, an eye specialist, in August, 1948. Plaintiff had previously read articles in the paper about defendant and knew that he was on the faculty and board of the hospital. On the occasion when plaintiff was first attended by Dr. Callahan, the doctor examined plaintiff's eyes and tested them to see how well plaintiff could see. On that occasion Dr. Callahan did not prescribe any change in the glasses plaintiff was then wearing. At that time plaintiff told defendant that a doctor had previously informed him that he had cataracts. On this the first visit of plaintiff to defendant's office, Dr. Callahan examined plaintiff's eyes thoroughly. In the course of the examination defendant told plaintiff that he couldn't improve on plaintiff's glasses. Defendant was very nice to plaintiff and said to him, "See you again in about sixty days."

About sixty days thereafter the plaintiff went again to the defendant's office. On that occasion the defendant again examined the plaintiff's eyes. He put a light on the chart and asked plaintiff to read the various lines. Defendant also handed plaintiff a little booklet and asked him to read it. On this occasion the plaintiff was attended by defendant, but defendant did not prescribe any change in plaintiff's glasses. He stated to plaintiff that he "couldn't better" plaintiff's glasses.

In March, 1949, plaintiff was again attended by the defendant who, upon completion of the examination, did not prescribe any change in plaintiff's glasses, but asked the plaintiff to return again for further examination at a stated time. Plaintiff did not return to defendant's office at the time suggested by defendant. Some time later plaintiff broke one of the lenses in his glasses and made an appointment with defendant and went to his office and defendant gave him a prescription with which to replace the broken lens.

Plaintiff had the prescription for the broken lens filled as directed by defendant. Plaintiff did not find that lens to be as satisfactory as the broken lens. Consequently he carried the broken lens to an optical company and had a lens like the broken one ground, with which he replaced the one prescribed by defendant.

Plaintiff did not see Dr. Callahan again until July 25, 1955. Immediately prior to July 25, 1955, the plaintiff called defendant's office by telephone and made an appointment. On that occasion he inquired as to the amount of defendant's fee for an eye examination and was advised that the fee was $15. Previously his fee had been $10.

On July 25, 1955, plaintiff went to defendant's office to keep the appointment. Shortly after he arrived he was directed by someone in the defendant's office other than Dr. Callahan into an examining room where his eyes were examined by a lady instead of Dr. Callahan. When Dr. Callaham came into the examining room plaintiff said to Dr. Callahan that he wanted him to examine his eyes. Dr. Callahan did not examine the plaintiff's eyes. He did not, as he had done on previous occasions, ask plaintiff to read letters on a chart or to read from the "little booklet." The plaintiff described what took place between Dr. Callahan and himself on that occasion and in brief the plaintiff claims that he said to Dr. Callahan, "I see too well for an operation," to which Dr. Callahan replied, "No, you can't see at all," and "he told me if I didn't have an operation at once I would be blind."

In this conference the plaintiff agreed to go to the hospital and undergo the surgery suggested.

When plaintiff agreed to go to the hospital Dr. Callahan asked if July 30, 1955, was agreeable to the plaintiff. The date being agreeable to plaintiff, it was agreed that on that date the plaintiff would enter the hospital. Thereupon arrangements were made for the plaintiff to enter the hospital on that date. At the time the plaintiff agreed to undergo cataract surgery Dr. Callahan told him to employ other physicians to ascertain his general condition, to see if he could withstand or undergo the surgery. Pursuant to these plans, the plaintiff entered the hospital on July 30, 1955.

When the defendant advised the plaintiff that he should undergo cataract surgery Dr. Callahan did not explain to the plaintiff the nature of cataract surgery, nor did he explain to plaintiff that cataract surgery was not always successful or that after cataract surgery plaintiff would have to wear glasses with heavy lenses.

When the plaintiff arrived at the hospital he went through the regular routine of entering and was assigned a room in the hospital. Upon reaching his hospital room two nurses came in and asked the plaintiff what he was there for. The plaintiff replied, "for an eye operation, a cataract operation," and asked the nurses what he was to do. The nurses replied, "Put on your pajamas, do anything you want to do, go to bed, sit down or walk around." Plaintiff asked one of the nurses if he might have a newspaper. She replied that she didn't know, but would find out. The nurse left the room and brought Dr. Nelson, whom plaintiff believed to be an intern, but who was in fact the resident physician in the eye department of the hospital. Dr. Nelson asked plaintiff what he was doing there. Plaintiff told him that Dr. Callahan had sent him over for a cataract operation. Dr. Nelson looked in plaintiff's eyes and walked away.

In the meantime, one of the nurses came in plaintiff's room with a sheet of paper and said, "Here is your do's and don't's. Can you read?" Plaintiff replied, "Sure I can read," and he read it. The do's and don't's to which the plaintiff referred were type-written sheets of instructions prepared by Dr. Callahan for patients upon admission to the hospital for cataract surgery.

From a reading of the do's and don't's plaintiff learned something of the nature of cataract surgery. Plaintiff thought all he had to do was to get the things off. When he read the do's and don't's he learned that the doctor was to put a towel across his eyes that day and the next morning and give him two shots, one that night and one Sunday morning, and the card went on to say that after the operation he would have to lie flat on his back for eight hours and not move or touch his hand to his eyes at all and if the pain got serious for him to call one of the nurses who would give him a sedative. During this interval Dr. Nelson came back into the hospital room and swabbed plaintiff's eyes with a piece of cotton.

Plaintiff asked Dr. Nelson for his opinion as to whether he should undergo the surgery, but Dr. Nelson did not answer. Dr. Nelson then took plaintiff to an examining

room in the hospital and examined plaintiff's eyes. The results of Dr. Nelson's examination were written on plaintiff's hospital chart. · The chart was introduced in evidence. It showed the following result of the examination of plaintiff's eyes by Dr. Nelson:

"This 76 year white male was admitted for cataract extraction. The visual acuity with correction was 2/40 OD, and was 20/30 OS. The intraocular pressure was normal. The operation was delayed due to the patient's personal affairs. He was discharged on on 7/30/55, in apparent good health."

Plaintiff told Dr. Nelson that he was going to leave the hospital. After some routine required of plaintiff by hospital personnel, he left the hospital on July 30, 1955, and returned to his home. Shortly after plaintiff returned to his home he called Dr. Callahan by telephone and told him that he had left the hospital and was not going to have the operation. During this conversation Dr. Callahan said to plaintiff, "You should have stayed for the operation. It is necessary to have it or you will go blind." The next day Dr. Callahan called the plaintiff by telephone and told the plaintiff that he was surprised plaintiff left the hospital and that he should have the operation "to keep from being blind." In that conversation Dr. Callahan said he would call plaintiff again in about ten days or two weeks. On about August 3 plaintiff received a letter from the Department of Public Safety, a copy of which was introduced in evidence by the plaintiff. In substance the letter stated that information had been received in the Director's office "which leads the Director to believe that it would be in the best interest of Public Safety to inquire [sic] that you appear before our drivers license examiner and take the eye test."

About the latter part of August plaintiff received two additional telephone calls from Dr. Callahan's office, in which the plaintiff was asked to come to his office. Plaintiff declined the invitations.

Upon receipt of the foregoing letter from the Department of Public Safety plaintiff made an appointment to have his eyes examined by Dr. Joe Dixon, an eye specialist in the city of Birmingham. Dr. Dixon reported his visual acuity test of the plaintiff's eyes as follows: "Right eye 20/40; left eye 20/25–1; both eyes 20/25–1."

In the latter part of August, 1955, plaintiff carried the letter, together with the completed report, to the driver's license examiner at Birmingham. At that time the driver's license examiner gave plaintiff the usual eye test given by that department. Plaintiff passed the test and his driver's license was not revoked.

I. The plaintiff put up as witnesses a number of experts on eye cataracts and cataract surgery. The first of these experts was Dr. Dixon. We see no reason to set out the discussion of cataract surgery as testified to by Dr. Dixon. Suffice it to say that at the conclusion of his testimony he testified that in his professional opinion it was clear from an ordinary examination of plaintiff's eyes that cataract surgery should not be performed on plaintiff's eyes.

The procedure used by Dr. Dixon in the examination of plaintiff's eyes was followed by the procedure of other doctors who examined plaintiff's eyes in consultation. For example, the opinion of Dr. Turnbull, an eye specialist who examined plaintiff's eyes on two occasions, was that the plaintiff would sustain a substantial loss of vision if he underwent cataract surgery. To the same general effect was the testimony of Dr. Frank H. Clements, an eye specialist, and also the testimony of Dr. John Hall Nelson. Dr. Ralph B. Burroughs, an eye specialist and a witness for the plaintiff, testified in effect that when he saw him cataract surgery if successful would have been bad for him and to the same effect was the testimony of Dr. Oscar Dahlene, an eye specialist.

Of course, Dr. Callahan in his testimony took issue as far as the condition of Mr. Sims was concerned that it was wise for him to undergo cataract surgery. His

opinion was supported by the record of Dr. Howard Smith, an optometrist. We believe that a careful examination will disclose that in each instance where a physician has testified in effect that no honest physician would have operated on Mr. Sims or that there was no professional or medical basis for such operation on him, the testimony is based on a different postulate from that existing as of the time he was in Dr. Callahan's office. By Mr. Sims' own testimony and by the record of Dr. Howard Smith, an optometrist, who had nothing to do with this controversy and took no part whatever in the prosecution or the defense of Dr. Callahan, the vision of Mr. Sims "comes and goes." Mr. Sims himself says that while he was over in the hospital and after the seed of distrust had been sown in his heart he could then see better than he had ever seen before. We believe that the medical aspects of this case present a clash between two opposing schools of thought in opthalmology, especially in regard to operations for cataracts. Perhaps this difference may be accentuated by some bitterness on the part of a few doctors. In other words, one school of thought believes in waiting longer than the other. But just exactly where the line of demarcation is, is not definitely ascertainable except that some seem to think it is generally, though not always, 20/70 visual acuity or less. Dr. Callahan does not believe in waiting that long. Neither does Dr. McCoy. In connection with the thought of some that 20/70 or less is a good rule, though not subscribed to by others, the appellant attempts to make capital by a reference to the Journal of the American Medical Association as follows:

"* * * Unless there is a secondary condition other than cataract necessitating removal, extraction of the lens is not indicated until there is serious interference with the patient's way of life. Since the two eyes will not work together after the lens of one is removed, there is no optical indication for removal of a monocular cataract when corrected vision in the better eye is more than 20/70."

But it is to be observed that what the author was there referring to is expressly stated as a monocular cataract. A monocular cataract is obviously and according to medical dictionaries one "concerning or affecting but one eye." But this is not applicable to the condition of Mr. Sims. Mr. Sims had binocular cataracts. He had cataracts in both eyes at the time he was seen by Dr. Callahan in July, 1955, and had had cataracts in both eyes for many years. We do not believe that it would be proper to say that because the result of the test was different on one occasion from that reported on another, though closely related in time, the other report was presumptively or necessarily false.

Dr. Dixon testified "that most anybody's vision will vary from one time to another. Sometimes when they come in the office and you will check it it will vary one hour later." According to him there could be a variation in the same day in different offices from 20/30 to 20/50 and it might vary from 20/40 to 20/60. Dr. Dixon found 20/60 in both eyes March 26, 1957, but 20/40 minus 2 and 20/30 on May 1, 1957. Six months later, in October, the vision had decreased 20/60 or a little better in the right eye and to 20/40 in the left, while the following month in consultation with Dr. Turnbull the vision had decreased from 20/40 to 20/50 in one eye and had increased from 20/60 to 20/50 in the other.

According to the tests in Dr. Callahan's office on the date involved they were 20/60 minus. A few days later, according to Dr. Nelson, they were 20/40 and 20/30 minus. In other words, if Dr. Nelson's testimony is accurate, it cannot be said that the tests made in Dr. Callahan's office were not correct. Certainly it cannot be said that they were knowingly and corruptly false.

As we read this testimony, there seems to have been a heated controversy between two medical schools of thought and nothing more. The difference seems to be that at the time Dr. Callahan advised the operation plaintiff desired it. When the other doctors examined him he didn't want it.

The attitude of the patient is a factor as to which there is no dispute. For instance, Dr. Clements said:

"I think that cataracts should be removed when the patient feels like his vision is too defective and that it interferes with his usual work and where he is unhappy * * * Whether the patients want to see better than they are able to see at that time."

The law does not permit a physician to be at the mercy of testimony of his expert competitors, whether they agree with him or not. In the case of Jackson v. Burton, 226 Ala. 483, 485, 147 So. 414, 416, this court said:

"* * * The rule of law under such circumstances is that: 'Where there are various recognized methods of treatment the physician is at liberty to follow the one he thinks best, and is not liable for malpractice because expert witnesses give their opinion that some other method would have been preferable.' Harzog on Med.Jur. § 183; 48 Corpus Juris. 1124, 1127; Carraway v. Graham, 218 Ala. 453, 118 So. 807; Barfield v. South Highlands Infirmary, 191 Ala. 553, 556(27), 68 So. 30, Ann. Cas.1916C, 1097."

As to the effect of all the testimony against Dr. Callahan, we quote from the case of Staloch v. Holm, 100 Minn. 276, 111 N.W. 264, 9 L.R.A.,N.S., 712, which was approved in Carraway v. Graham, 218 Ala. 453, 118 So. 807, 814, as follows:

"He [the surgeon] is faced by the eccentricities of medical experts. We have no inclination to share in the prevalent and intemperate denunciation of their unreliability and veniality. But if every verdict mulcting a reputable physician in damages must be sustained if any of his professional brethren can be induced to swear that, assuming the testimony of the family and friends of the patient to be true, the physician had made a mistake of judgment or had been guilty of unscientific practice, then the profession would be one [in] which 'unmerciful disaster follows fast and follows faster.'"

We come now to deal directly with the grounds on which reversal is sought. First of all is the admissibility of testimony of former patients of Dr. Callahan as to the results of cataract operations upon them in rebuttal of evidence offered by plaintiff and admissible for that reason. We certainly agree with the general proposition that evidence of transactions between the defendant and third parties with which the plaintiff has had no connection is not ordinarily admissible against a plaintiff. But that is true only in those cases where the evidence is incompetent, irrelevant or immaterial. We think the evidence is competent in this case because of the fact that the appellant opened the door for its admission by the testimony of his own witnesses.

The plaintiff's second witness on the trial of the case was Dr. Frank Clements. On direct examination Dr. Clements testified as an expert in operating on cataract patients, but the plaintiff appears not to have been contented with that testimony. Dr. Clements further testified in detail as to his own personal experience as a patient of another physician when he himself had been operated on for cataracts. He was thereby doing exactly that which the plaintiff now says defendant had no right to do, that is, prove by individual experiences the result of an operation. It would have been unjust for the court to have allowed that evidence to remain in the case and have the jury affected by that sort of a description by a patient of the results of a cataract operation without allowing defendant to show the experiences of patients whose overall results from and reactions to the operation were entirely different. In other words, the broad proposition is asserted that the testimony of the various witnesses was not admissible by reason of its alleged incompetency. If one party offers such evidence he cannot thereafter complain even though there is much evidence to the contrary. We

have examined the evidence from this standpoint very carefully and do not think it necessary to set out the evidence on this point.

It is well established in this state that a party cannot justly complain of evidence offered in rebuttal of evidence which he himself presented. In Lockridge v. Brown, 184 Ala. 106, 112, 63 So. 524, 526, this court expressly held: "* * * A party cannot complain of the admission of illegal evidence, in rebuttal of illegal evidence introduced by himself."

In Royal Ins. Co. v. Robertson, 242 Ala. 460, 465, 6 So.2d 880, 884, this court said:

"* * * Such contradictory evidence offered by plaintiff was admitted without error under the rule that obtains in this jurisdiction, that a party cannot complain of admission of illegal evidence in rebuttal of illegal evidence introduced by him. * * *"

We need not go into any further detail in this connection except to say that plaintiff's attorney went into detail, particularly from his first two witnesses, in an effort to show ill effects upon the patients of cataract operations in the reduction of vision.

In the case of Baird v. Chicago, M., St. P. & P. R. Co., 179 Minn. 127, 228 N.W. 552, there had been opinion evidence of expert witnesses for the plaintiff to the effect that with the loss of certain fingers on his hand he was unable to do the work of a switchman. Defendant introduced evidence of switchmen with similar or worse injuries who testified that they did and were able to do the work of switchmen. In holding that such evidence was admissible, the court said:

"* * * Properly enough, defendant produced as witnesses four switchmen or switch foremen, who for years have been employed by defendant in its switchyards; each having one hand mutilated more than was plaintiff's. These men testified that, in spite of missing fingers and as to one even the whole hand, they did the work of switchmen without much difficulty. For plaintiff, medical experts had ventured the opinion that plaintiff could never again work as a switchman. * * * It is submitted that on the issue of damages it was just as proper to bring in men who, with similar or worse hand injuries, were actually doing the work and earning the wages which plaintiff's medical experts said plaintiff could never do or earn. We think counsel's attack on defendant for adducing entirely proper, and as we consider the very best, testimony bearing on the damages to be assessed by the jury, was uncalled for * * *." (228 N.W. 553–554.)

In conclusion it is sufficient to say that there was no error in the ruling of the court allowing witnesses who were former patients of Dr. Callahan to testify as to the result of cataract operations upon them in rebuttal of evidence offered by the plaintiff and admissible for that reason.

II. It is claimed that the trial court erred when during the trial of the case objections were sustained to the following question propounded by the plaintiff to the defendant on cross-examination of the defendant as a witness. The purpose of the question, of course, was to attack the credibility of Dr. Callahan as a witness. We set out the question as follows:

"Doctor, did you plead guilty in the United States District Court for the Northern District of Alabama, Southern Division, in the case of United States of America against Alston Callahan, case No. 13559, to the offense of mailing in the United States Mail certain obscene, lewd, lascivious and filthy pictures?"

In answer to the proposition that a violation of 18 U.S.C.A. § 1461, inhibiting the act of placing in the mail obscene, lewd, lascivious and filthy pictures, is a crime involving moral turpitude, in Ex parte Marshall, 207 Ala. 566, 93 So. 471, 25 A.L.R.

·338, this court, in defining the phrase "moral turpitude," said:

"Section 4008 of the Code of 1907 (now Title 7, Section 434, 1940 Code of Alabama) provides that no objection can be taken to the competency of a witness because of conviction for crime, except perjury or subornation of perjury, 'but if he has been convicted of a crime involving moral turpitude, the objection goes to his credibility.' This court has several times defined the words 'moral turpitude,' as used in this provision, as meaning something immoral in itself, regardless of the fact that it is punished by law. It must not merely be mala prohibita, but the act itself must be inherently immoral. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude. Pippin v. State, 197 Ala. 613, 73 So. 340; Gillman v. State, 165 Ala. 135, 51 So. 722. This court has also expressly held that a conviction for distilling liquor did not involve moral turpitude and that it was reversible error to permit proof of such a fact to affect the credibility of a witness. Lakey v. State, 206 Ala. 180, 89 So. 605."

There is no showing in the record that the act done by Dr. Callahan was inherently immoral. The following is a statement of offenses which do not involve moral turpitude and cases which discuss such offenses:

Assault and Battery—Gillman v. State, 165 Ala. 135, 51 So. 722; Collins v. State, 3 Ala.App. 64, 58 So. 80.

Bootlegging—Wiggins v. State, 27 Ala. App. 451, 173 So. 890.

Selling Cocaine—Pippin v. State, 197 Ala. 613, 73 So. 340.

Distilling, or otherwise violating prohibition laws—Lakey v. State, 206 Ala. 180, 89 So. 605.

Doing Business Without License—Craven v. State, 22 Ala.App. 39, 111 So. 767.

Trespass to Land—United States Lumber & Cotton Co. v. Cole, 202 Ala. 688, 81 So. 664.

Vagrancy (in absence of showing of act characterized as vagrancy)—Bryan v. State, 18 Ala.App. 199, 89 So. 894.

Using Abusive and Obscene Language—Craven v. State, 22 Ala.App. 39, 111 So. 767.

Public Drunkenness—Grammer v. State, 239 Ala. 633, 196 So. 268; Craven v. State, 22 Ala.App. 39, 111 So. 767.

Violation of Harmon Narcotic Act—Peters v. State, 240 Ala. 531, 200 So. 404.

■ We see no reason to analyze each of these cases. They speak for themselves. This court has said that moral turpitude implies something immoral in itself, regardless of its being punishable by law, so that an offense for conviction of which a witness' credibility is lessened must be *mala in se* and not *mala prohibitum*. Pippin v. State, 197 Ala. 513, 73 So. 340; Ex parte Marshall, 207 Ala. 566, 93 So. 471, 25 A.L.R. 338.

■ The court considered the matter in the absence of a jury and considered that the cases and authorities reached the conclusion that the offense was one that did not involve moral turpitude. We find that the decision of the court was correct and that his judgment should not be disturbed.

III. Appellee's given charges stated correct principles of law and the trial court committed no error in giving these charges to the jury.

By this assignment appellant seeks a decision of this court on the correctness of some written charges requested by appellee and given to the jury by the trial court. In order to pass on these charges, we should look to Count A of the complaint to see what allegations are made against Dr. Callahan. As here pertinent Count A reads:

"* * * And plaintiff avers * * *, defendant did willfully and falsely represent to plaintiff, with the intent to

injure plaintiff, that plaintiff should undergo immediate surgery to remove cataracts and other growth from his eyes, else run the risk of blindness or Great loss of vision, * * *; that said representation was made by defendant to induce plaintiff to undergo said surgery as a patient of defendant in order that defendant might collect from plaintiff a fee for performing said surgery; that the plaintiff, in reliance upon said representation, and believing the same to be true, but which was untrue, and known by defendant to be untrue, consented and agreed to allow defendant to perform surgery on plaintiff's eyes to remove said cataracts and other growth from his eyes. * * *"

The foregoing excerpt from Count A charges that Dr. Callahan (1) willfully made a false representation to plaintiff, (2) with intent to injure him, and (3) that Dr. Callahan knew the representation was false and untrue. In this way the appellant has charged Dr. Callahan with making a known false representation with intent to injure him. Accordingly cases like Munroe v. Pritchett, 16 Ala. 785, and Cartwright v. Braly, 218 Ala. 49, 117 So. 477, and similar cases cited in appellant's brief are not in point. In those cases it was not alleged in the complaint that the defendant had made a known false statement to plaintiff with intent to injure him.

■ It appears that the appellant now wishes to have this case reviewed and treated as if the cause of action had been stated under the alternative provisions of § 108, Title 7, Code 1940, defining legal fraud as "misrepresentations of a material fact, made * * * recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently, and acted on by the opposite party, * * *." or under the provision of § 110, Title 7, Code 1940, defining deceit and providing that "a fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to

deceive, is equivalent to a knowledge of the falsehood." But the complaint was not framed under these provisions. Instead, the complaint was framed and tried on the first alternative of § 108: "Misrepresentations of a material fact, made wilfully to deceive * * * and acted on by the opposite party * * *." The charges in the instant case should be considered in the light of the allegations of the complaint. These allegations are similar to the allegations in the cases of Clayton v. Glasscock, 221 Ala. 3, 127 So. 538, and Clayton v. Quiatto, 221 Ala. 677, 130 So. 395. In the Glasscock case the complaint charged defendant with making false representations to the plaintiff which " * * * were made by him with full knowledge on his part that they were not true, and were made for the purpose of deceiving the plaintiff and did deceive her to her damages as aforesaid." [221 Ala. 3, 127 So. 539.]

Charge 2 requested by the defendant in that case and refused reads as follows:

"The court charges the jury that the plaintiff cannot recover under the second count of the complaint unless defendant intended to deceive the plaintiff."

Further in that case the trial court charged the jury as follows:

"Count 2 of the complaint sets up facts that she was deceived by representations made by the defendant and before the plaintiff can recover there must be what we call actionable deceit. We have a statute defining actionable deceit which I think will apply in this case, and which I will read in your hearing. First it says: 'Wilful misrepresentation of a material fact, made to induce another to act, and upon which he does act to his injury, will give a right of action.' I will read that again, 'Wilful misrepresentation of a material fact, made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such fact,

unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood.' That is the definition of actionable deceit under our law."

In reversing the trial court for failure to give Charge 2 and in orally charging the jury as it did, this court said:

"While some confusion has arisen in the application of sections 5676, 5677, and 8049 of the Code of 1923, in cases of deceit and fraud and which we attempted to reconcile in the case of Cartwright v. Braly, 218 Ala. 49, 117 So. 477, the present complaint avoids the necessity of drawing distinctions or explanations as to the field of operation of said sections respectively. It charges, in specific terms, that the representations made by the defendant 'were made by him with full knowledge on his part that they were not true, and were made for the purpose of deceiving the plaintiff and did deceive her to her damages as aforesaid.'

"Charge 2, requested by the defendant, should have been given. Likewise, the trial court erred in reading certain parts of the statute to the jury which were inapt, as they did not apply to the issue in the case as made by the complaint." 221 Ala. 4, 127 So. 539.

To the same effect is Clayton v. Quiatto, supra. The defendant's refused charge reads as follows:

"1. If there was no purpose on the part of the defendant to deceive plaintiff as charged then there can be no recovery for plaintiff under the second count of this complaint." [221 Ala. 677, 130 So. 395.]

To summarize the situation, in our judgment the Glasscock and Quiatto cases justly sustain the action of the trial court in giving the charges here complained of by appellant. As stated above, we find no error in this ruling of the court.

IV. The demurrer to Count 2 was properly sustained.

Count 2 attempts to set up a cause of action for malpractice. For the purposes of present discussion the count alleges:

"* * * And the plaintiff avers that the defendant conducted himself in such unskillful and negligent manner in and about the diagnosis, treatment and care of plaintiff's eyes that the defendant advised plaintiff that plaintiff should undergo immediate surgery to remove cataracts and other growth from plaintiff's eyes, else run the risk of blindness or great loss of vision; that as proximate consequence of said unskillfulness and negligence of defendant in advising plaintiff that he should undergo immediate surgery to remove cataracts and other growth from plaintiff's eyes, plaintiff was injured and damaged as follows:"

It is evident from the entire count that the plaintiff has not alleged that defendant unskillfully and negligently treated plaintiff's eyes nor has he charged that defendant unskillfully and negligently cared for plaintiff's eyes. All that he has undertaken to charge is that the defendant made an unskillful and negligent diagnosis. Here is the key averment:

"* * * defendant conducted himself in such unskillful and negligent manner in and about the diagnosis * * * of plaintiff's eyes that the defendant advised plaintiff that plaintiff should undergo immediate surgery * * *"

For aught appearing from the allegations of the foregoing count, Dr. Callahan's diagnosis was true and correct and the advice

given plaintiff was right and proper and plaintiff should have undergone immediate surgery.

■■ On demurrer allegations of a complaint are to be construed most strongly against the pleader. Pleadings are required to be certain and specific in their allegations of the material facts on which the right to relief depends so that the charge need not be left to inference merely what those facts are. Richards v. Richards, 98 Ala. 599, 12 So. 817, quoted with approval in Smith v. Smith, 216 Ala. 570, 114 So. 192.

■■ The making of a diagnosis by a physician is a lawful act and it is only when a lawful act is done negligently or improperly and thereby causes injury that there arises a cause of action. Construing the allegations of Count 2 most strongly against the pleader, it cannot be said that the diagnosis was incorrect or wrong and that the advice given plaintiff was incorrect.

There was no error in sustaining the demurrer to Count 2 of the complaint.

V. There was no error in sustaining the demurrer to Count B. As here material Count B alleges:

"* * * And the plaintiff avers that the defendant conducted himself with such wanton and reckless indifference in and about the diagnosis, treatment and care of plaintiff's eyes that defendant wantonly and with reckless indifference advised plaintiff that plaintiff should undergo immediate surgery to remove cataracts and other growth from plaintiff's eyes, else run the risk of blindness or great loss of vision.

"That plaintiff did not need to undergo said surgery or run the risk of blindness or great loss of vision. And the defendant knew or in the exercise of ordinary care and diligence ought to have known that plaintiff did not need to undergo said surgery or run the risk of blindness or great loss of vision and, the defendant knew or in the ex-

ercise of ordinary care and diligence ought to have known that, said surgery if successful[ly] performed would have resulted in plaintiff sustaining a substantial loss of vision. * * *"

■ In Count B the effort is made to charge wantonness, but it is fatally defective for two reasons: (1) The averments "And the defendant knew *or in the exercise of ordinary care and diligence ought to have known* that plaintiff did not need to undergo said surgery * * * the defendant knew *or in the exercise of ordinary care and diligence ought to have known* that, said surgery if successful[ly] performed would have resulted in plaintiff sustaining a substantial loss of vision," will not support a wanton count because of the alternative averment concerning knowledge which has been underscored.

In Central of Georgia Ry. Co. v. Chambers, 183 Ala. 155, 62 So. 724, 726, the wanton count in a railroad crossing case averred: "* * * defendant knew or by the exercise of reasonable care should have known that this plaintiff was crossing said railroad * * * and with such knowledge the defendant's agents and servants, * * * willfully, wantonly, and negligently * * *." did certain acts and omitted to do certain acts as to injure plaintiff.

In holding that the counts were not sufficient as to wanton counts, the court said:

"* * * The allegation is, not categorically that defendant's agents knew, but alternatively that they knew, or (count 7) by the exercise of ordinary care should have known, or (count 9) by the exercise of reasonable care would have known, that persons were crawling over or under or going between the cars. A failure to take precaution against a mere possibility, or even a probability, that persons would put themselves in a position which would be rendered dangerous by a movement of the train, in the absence of knowledge that some such condition then actually existed, cannot be tor-

tured into anything more offensive to law or morals than simple negligence. * * *" 183 Ala. 170–171, 62 So. 728.

See also Francis v. Imperial Sanitary Laundry & Dry Cleaning Co., 241 Ala. 327, 2 So.2d 388; Griffin Lumber Co. v. Harper, 247 Ala. 616, 25 So.2d 505; Southern Ry. Co. v. Bunt, 131 Ala. 591, 32 So. 507.

Other insufficiencies in the count could be pointed out, but the foregoing is sufficient to show that the court was not in error in sustaining the demurrer to Count B of the complaint.

VI. There was no error in admitting in evidence defendant's Exhibit 18. This exhibit is a copy of the medical record on the plaintiff as kept by the defendant, the original having been lost through no neglect of the defendant.

Secondary evidence becomes admissible where the writing containing or constituting the primary evidence of the fact to be proved is satisfactorily shown to have been lost or destroyed without the fault of the party desiring to prove the fact and where, in the case of a lost instrument, the party has made a proper search for the instrument. 32 C.J.S. Evidence, § 823.

Preliminary proof of the loss or destruction of primary evidence is addressed solely to the trial court and its sufficiency is a question for the court and not for the jury. The sufficiency of evidence on the preliminary proof rests in the sound discretion of the trial court. Sorrell v. Scheuer, 209 Ala. 268, 96 So. 216. See also J. R. Watkins Co. v. Goggans, 242 Ala. 222, 5 So.2d 472. It may be added that the appellant did not before its admission interpose any grounds of objection to the genuineness of the copy, its correctness and the location of the original. He did not complain that it was not the best evidence. He interposed no objection that it contained conclusions and opinions. He waived all such grounds and he cannot now complain. We find no error in this ruling of the court.

This case seems to us to be unprecedented in this state so far as we can tell. A surgeon is being sued for deliberate fraud in recommending an operation which he never performed, an operation which the undisputed evidence shows he was capable of performing. His qualifications have never been questioned. Obviously, the defendant was at a disadvantage in attempting to defend that kind of a charge. The defense was solely not guilty. In the final analysis, in our judgment there was no way for the case to be tried any better than it was tried and it seems to us that the jury rendered a just and righteous verdict which should not be disturbed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.