SHORES, Justice.
In late October 1980, 38-year-old Emma James was five feet four inches tall, weighed 316 pounds, and was an obstetrics patient with high blood pressure and gestational diabetes. Mrs. James was a patient at the high risk clinic of the University of South Alabama Medical Center.
Mrs. James lives in Camden, Alabama, and when she went to the hospital in Mobile on October 28,1980, in the final stages of her pregnancy, the doctors decided that it was better to admit her rather than to have the risk of her having trouble getting back to Mobile from Camden within twelve hours. On the first day of admission, Dr. Mendenhall, Dr. Andrianopoulos, and Dr. Woolley considered and discussed the question of vaginal versus cesarean delivery. The discussion centered on the risk to Mrs. James from any treatment because of her obesity, diabetes, and high blood pressure, which appeared to be worsening. The group felt that a cesarean section was fraught with major risks to a 316-pound, 38-year-old woman who was diabetic and hypertensive. The doctors agreed that the technical problems were immense and determined that the best method, with the least risk to the mother, would be a vaginal delivery.
Since there was a possibility of a large baby, due to Mrs. James’s size and prenatal diet, the doctors specifically considered the various risks involved in a vaginal delivery of a large baby. They felt that a woman as large as Mrs. James would be able to deliver vaginally a large baby. Their most prevalent concern was the possibility of Mrs. James’s death. Dr. Woolley suggested vaginal delivery instead of cesarean, pointing out:
“[T]he technical problems were immense, ... the risks to the mother were very high, [and] vaginal delivery posed less of a risk to the mother.”
According to Dr. Woolley, the reason for risk to the mother in a cesarean section, in addition to high blood pressure and diabetes, was the enormous size of Mrs. James.
*111 Dr. Mendenhall made the final decision to perform a vaginal delivery and also determined that it would be appropriate to induce labor. On October 29, the labor-inducing drug “Pitocin” was introduced, and contractions began. However, the baby was not delivered, and the Pitocin was terminated that night. On October 30, Pitocin was again administered to Mrs. James. The first contraction began at 9:00 a.m., and labor progressed within normal limits.
Dr. Mendenhall was not on duty and was not present during the actual delivery. The procedure at the University of South Alabama Hospital was that first-year residents conducted vaginal deliveries, with, fourth-year residents nearby to assist with or handle any problems.
The vaginal delivery of Mrs. James’s baby was begun by Dr. Childs,[1] a first-year resident. During the birth of Quenshelia, a potentially lethal complication known as “shoulder dystocia” occurred. After the delivery of the head, Quenshelia’s shoulders would not deliver, even though an episioproctotomy had been made instead of an episiotomy, to get as much room in the birth canal as possible.
When this complication occurred, Dr. Woolley and Dr. Whitten were summoned to assist Dr. Childs. Dr. Woolley and Dr. Whitten, along with Dr. Goldstein, entered the delivery room to help. However, their efforts were hampered because there was no room to work due to the immense size of Mrs. James’s thighs. The situation required a medical student to hold back one thigh and a nurse to hold back the other.
There are several medically recognized methods of dislodging a baby’s stuck shoulder in a dystocia situation: 1) the “Woods screw maneuver,” 2) delivery of the baby’s posterior arm, 3) application of pressure or pushing on the mother to dislodge the anterior shoulder, or 4) actually breaking the clavicles of the baby. In this case, three different doctors were using three different approaches at the same time. Dr. Woolley tried the “Woods screw maneuver” and began to turn the baby’s body 90 degrees, but the shoulder did not dislodge. Dr. Goldstein applied suprapubic pressure and pushed on the baby’s anterior shoulder. Dr. Whitten was kneeling down beneath Dr. Woolley and beneath the vagina; he delivered the posterior arm, the baby dislodged, and Dr. Whitten delivered the baby, which weighed 11 pounds 6 ounces.
This whole series of events took only three to four minutes, and the baby responded with minimal resuscitative efforts. However, there is no dispute that, following birth, the baby had a paralyzed arm.
This medical malpractice action was filed by the baby, Quenshelia James, by and through her parents and guardians, Walter James, Jr., and Emma Lee James. The complaint alleged that the doctors were negligent and that their negligence caused the infant to be injured during birth. The defendants supported their motions for summary judgment with the deposition testimony of all the defendants, which established the facts as set out above. Plaintiffs appeal from a summary judgment in favor of the defendants. We reverse and remand.
The appellants’ primary contention is that the defendants were negligent in opting for vaginal delivery instead of recommending a cesarean section. In opposition to the defendants’ summary judgment motion supported by their deposition testimony, the plaintiffs-appellants submitted the affidavit of Dr. Bernard Nathanson, in which he stated:
“Based on the foregoing it is my opinion that the physicians responsible for planning and supervising the delivery of Mrs. James’ baby, Quenshelia James, failed to exercise that degree of care, skill and diligence ordinarily exercised by physicians in the fields of obstetrics and gynecology generally; in my opinion, Dr. Barbara L. [sic] Woolley failed to exercise that degree of care, skill and diligence ordinarily exercised by physicians in the fields of obstetrics and gynecology *112 generally in that she (1) failed to advise a cesarean section delivery of Quenshelia James, and (2) failed to properly supervise the delivery of Quenshelia James. Such substandard care caused or contributed to cause the paralysis to the baby’s right shoulder, arm, and hand.”
In addition, the appellant opposed the defendants’ motion for summary judgment by offering the deposition testimony of Dr. Nathanson. Dr. Nathanson testified in his deposition that Drs. Mendenhall and Wool-ley violated the appropriate standard of care in failing to order a cesarean section for the delivery of Mrs. James’s baby. Dr. Nathanson testified:
“Q. I understand that you formed some opinions about this case based on your review of all of those documents.
“Would you tell us what opinions you have formed on this case?
“A. Yes. There were violations of the standard of care on this case.
“Q. That’s simple to say, but could you be a little bit more explicit?
“A. Yes. There was a failure on the part of the physicians here to apprehend the macrosomic state of this infant. The failure to apprehend the very high risk status of this woman.
“Q. High risk in what regard?
“A. She was obese. She was a gestational hyper-diabetic. She was hypertensive. She had had a rather formidable weight gain during the pregnancy. She clearly had a macrosomic infant in útero.
[[Image here]]
“Q. As I understood your testimony, correct me if I’m wrong, it’s your opinion in that case that this lady should have had a C-section, period.
“A. Yes. She should have had a cesarean section when she was admitted to the hospital, and it was an ongoing violation of the standards of care thereafter.

“....

“Q. Do you believe that every pregnant woman who presents, as Mrs. James did in this case, should have a C-section without any consideration of seeing whether or not she could vaginally deliver prior to the C-section?
“A. Anytime a woman, particularly a gestational diabetic in particular, is estimated to have a baby in excess of 4,000 grams, a cesarean section should be done.
“Here, by the way, I am quoting from the technical bulletin of the American College of Obstetricians and Gynecologists.”
These statements create a genuine issue of material fact requiring resolution by a jury. While it strains credibility to suggest that the weight of the baby is the single determining factor when a physician must decide between a vaginal and a cesarean delivery, it is not a function of the Court to pass on the credibility of the witnesses. This function is reserved for the jury. Dr. Nathanson’s testimony, that a cesarean should always be performed if the baby weighs in excess of 4000 grams stands in stark contrast to the testimony of the defendant physicians. The jury must resolve this factual conflict.
When a doctor makes an informed choice between alternatives that are viable under the circumstances, that doctor is not shown to have committed malpractice simply because another doctor, with the benefit of hindsight, claims that, after considering the identical information available to the first doctor, he would have chosen a different viable alternative. This rule of law was stated in Sims v. Callahan, 269 Ala. 216, 255, 112 So.2d 776 (1959), as follows:
“The law does not permit a physician to be at the mercy of testimony of his expert competitors, whether they agree with him or not....
“ ‘... The rule of law under such circumstances is that: “Where there are various recognized methods of treatment the physician is at liberty to follow the one he thinks best, and is not liable for malpractice because expert witnesses give their opinion that some other method would have been preferable.” ...’”
269 Ala. at 225,112 So.2d at 783. In Sims, we added:
“ ‘[The surgeon] is faced by the eccentricities of medical experts. We have no *113 inclination to share in the prevalent and intemperate denunciation of their unreliability and veniality. But if every verdict mulcting a reputable physician in damages must be sustained if any of his professional brethren can be induced to swear that ... the physician had made a mistake of judgment or had been guilty of unscientific practice, then the profession would be one [in] which “unmerciful disaster follow[s] fast and follow[s] faster.” ’ ”
269 Ala. at 225, 112 So.2d at 783 (quoting from Staloch v. Holm, 100 Minn. 276, 111 N.W. 264 (1907), in turn quoting E.A. Poe, “The Raven”).
In the instant case, however, the plaintiff’s expert testified that the conduct of the defendants fell below the standard of good medicine under the circumstances presented here, and goes beyond simply disagreeing with the alternative selected.
This Court has repeatedly held that summary judgment should not be granted where there is presented any evidence from which an inference may be drawn in support of the non-movant’s claim. Allen v. Mobile Infirmary, 413 So.2d 1051 (Ala. 1982).
We have read all of the evidence presented in support of the defendants’ summary judgment motion, and that offered by the plaintiff in opposition thereto. We are clear to the conclusion that the trial court erred in granting summary judgment in favor of the defendants. There are material issues of fact that must be left to the jury-
Accordingly, the judgment of the trial court is reversed, and the cause is remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, ALMON, ADAMS and HOUSTON, JJ., concur.
BEATTY, J., concurs in the result.

. At the time this delivery occurred, Dr. Childs was surnamed Mattox. We will refer to her as Dr. Childs for consistency and clarity.