This case involves a claim of medical malpractice against Dr. C.R. Armbrester and the Enterprise Hospital and Nursing Home. The gist of the action is that Dr. C.R. Armbrester negligently diagnosed and treated plaintiff's medical condition below the standards required by the medical community. Plaintiff also claims that Enterprise Hospital and Nursing Home failed to meet the standard of care of hospitals dealing with a case such as hers.
The trial court granted summary judgment in favor of both defendants, thus bringing to a final conclusion plaintiff's litigation, hence this appeal. We affirm.
The important facts which triggered this litigation are as follows:
The plaintiff, Sheryl Hines, was first seen by Dr. Armbrester in the second trimester of her pregnancy on September 25, 1980. She continued to see him periodically, and on January 5, 1981, she was admitted to the Enterprise Hospital and Nursing Home for the delivery of her baby. The delivery was accomplished on the same day of the admission. Plaintiff's sojourn in the hospital was as uneventful as her prenatal treatment, and she was discharged from the hospital on January 8, 1981. On January 13, 1981, plaintiff called Dr. Armbrester, complaining of having afterbirth pains, and he prescribed a medication for this complaint. On January 18, 1981, plaintiff called to tell her doctor that she was passing some blood clots. Dr. Sanders, standing in for Dr. Armbrester, admitted plaintiff *Page 304 
to the hospital. On January 19, 1981, Dr. Armbrester consulted with Dr. Sanders and then treated plaintiff with medication for vaginal bleeding and discharged her on January 20, 1981. Dr. Armbrester noted that the medication was reducing the bleeding.
Again, on January 23, 1981, plaintiff complained about vaginal bleeding and again plaintiff was given medication until January 25, 1981, when she was discharged. She was not seen by Dr. Armbrester after January 25, 1981.
On January 27, 1981, the plaintiff was seen by Dr. Taylor Caffee at his office in Ozark, Alabama. The next day he performed a D C on plaintiff and within two weeks, she was completely recovered. Her uterus had returned to normal size and the bleeding had stopped.
There is only one issue in this case. That issue is whether the trial court was correct in granting summary judgment for each of the defendants in this case, based on the pleadings, affidavits, and depositions filed herein.
Plaintiff strongly urges us to observe the general principle that under ordinary circumstances summary judgment is inappropriate in negligence cases because these cases, by their very nature, involve fact-finding determinations on the reasonableness of the defendant's conduct, which the jury is in the best position to assess. Plaintiff argues that the testimony of Dr. Taylor Caffee provided at least a gleam, glimmer, spark, or particle of evidence of negligence, thus providing the necessary scintilla which would entitle plaintiff to a jury trial to determine negligence vel non. She says that even though Dr. Armbrester, in his deposition, stated that his treatment of plaintiff, even though conservative, was in keeping with the standards of care of the medical profession for the treatment of this case, the deposition of Dr. Taylor Caffee rebutted this statement, thus providing the scintilla of evidence required to allow plaintiff to go to the jury.
Both doctors conclude that plaintiff's problem was caused by a retained placenta. Plaintiff claims that the failure to immediately remove this necrotic placental tissue, and allowing it to become inflamed in the vaginal vault, are not in keeping with the standard required in the medical community.
The damaging evidence in this case, according to the plaintiff, is Dr. Caffee's deposition testimony. That testimony is as follows:
 Q. Do you feel that it's necessary that the placenta be removed in all cases after birth?
A. It's unquestionable.
 Q. And if a doctor permitted placental tissue to remain in a woman after birth, that would not be within keeping of the standard medical procedures in this area?
A. That would not be in keeping with the standards.
The deposition also shows:
 Q. Would you say Doctor, that if a doctor knows that the patient has retained some of the placental tissue and has not passed it all, that it would not be medically accepted for him not to do anything? It's not medically acceptable?
 A. Yes, he should have made some attempt at removing the retained placenta.
We certainly would agree with plaintiff that her medical expert, Dr. Caffee, had provided the necessary scintilla to allow this case to go to the jury if this were the whole of his testimony. This case is strikingly similar to a recent decision of this Court in a medical malpractice case where we said that if a portion of the testimony of plaintiff's expert were viewed abstractly, independently, and separately from the balance of his testimony it would appear sufficient to defeat a motion for summary judgment. Malone v. Daugherty, 453 So.2d 721 (Ala. 1984). However, we are not to view testimony so abstractly. We are to view the testimony as a whole, and, so viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to prove. In other words, can we say, considering the *Page 305 
entire testimony of the plaintiff's expert, that an inference that the defendant doctor had acted contrary to recognized standards of professional care was created? We have also applied the same principle in the regular negligence context.Alabama Power Company v. Smith, 409 So.2d 760 (Ala. 1982).
Let us view the testimony of plaintiff's expert in the light of these standards:
 Q. Doctor, in your professional opinion, considering the size and the amount of material you removed from Sheryl Hines, what would or should have been done at the time had that amount of material been noticed to be missed from the placenta?
A. An attempt would have been made to retrieve it.
Q. Manually?
A. Yes, or with sponge —
 Q. If that attempt had failed, what would be the next attempt?
 A. There are drugs that cause contraction of the uterus which work —
 Q. So, it is accepted, especially in a situation where there had to be manual delivery of the placenta, is it not, to administer —
A. It is accepted —
 Q. Based on the history that you were in fact told, that's what Dr. Armbrester had done in this case, is that correct?
A. Yes, he had used another drug, too.
 Q. Is it accepted medical practice to attempt to have the uterus expel the placental material through the use of drugs prior to doing D C?
A. Yes.
 Q. What, in your opinion, is the reason for attempting to have a uterus expel these materials rather than doing a D C first?
 A. Well, the economics of a D C and then the risk involved in general anesthetics is not insignificant, and the other social pressures that a young mother has with a new baby precludes at some time — would make one to try the other means before putting her back in the hospital, in hopes of —
 Q. Based on the history that Sheryl Hines gave you, was that done in this case? In other words, attempts to have the material expel through the —
 A. She was readmitted to the Coffee General Hospital 2 or 3 times after she was discharged and after having the baby. At those times he did give her I.V. fluids and gave her the medications.
 Q. Would you characterize Dr. Armbrester's treatment there as being conservative treatment of possible retained placenta material?
A. Yes.
 Q. Do you in your professional opinion, have any criticism of Dr. Armbrester's treatment of Sheryl Hines' delivery of the baby and the treatment of her postpartum?
 A. Well, like I tried to say before, the only reason that I even recommended the D C was because of the length of time between the delivery and the fact that she was still having heavy bleeding. You know, after something goes on this long, you need to go ahead and stop it and —
 Q. Do you criticize Dr. Armbrester for delaying in performing the D C?
 A. No, I'm just saying that it's a difference of opinion. I would have gone ahead and done it sooner.
 Q. Are you stating that in your opinion though that Dr. Armbrester did not meet the standard of care in this community and —
A. No, I didn't say that.
 Q. You're not giving that as your opinion? You are saying you have a difference of opinion, but you're not saying that Dr. Armbrester committed an outright —
A. No, I am not.
And plaintiff's expert further testified:
 Q. When a baby is born, does the attending physician make sure that the afterbirth is also delivered?
. . . . *Page 306 
 A. He attempts to ascertain that the placenta has passed. No, this is not a one hundred percent thing now. It's not always black and white because sometimes the placenta is distorted or it comes out in pieces, and sometimes it has to be removed manually and sometimes it doesn't come out at all. It has to be — you have to go straight from the delivery room to the operating room and do the D C, actually scrape it.
. . . .
 Q. Doctor, what I am trying to find out now is if the placenta is delivered, can a doctor ascertain by looking at the placenta and by examining it whether all of it has come out or whether there is some still —
 A. As a general rule, if there are no extenuating circumstances, he should be able to tell if it's all present.
 Q. And in those cases where it is not all present, what is the accepted and the usual medical technique that's used in this area?
 A. By visual examination and by picking it up you can see that if it fits together it's all there, if it doesn't there is an open space in it.
 Q. And then you attempt to remove the rest of it or —
A. If you can do this.
Q. And if you can't, you have to do a D C?
 A. If you can't, then you try to give the drugs that cause the uterus to contract and quite often this will expel the retained placenta, and if this is not successful then surgical removal is necessary.
 Q. Would you say it is necessary to remove the placenta and all the placental tissue after —
 A. If a sufficient amount of placenta remains in the uterus, the uterus cannot go through a normal process of involution that occurs after the space has been emptied. When this is interfered with, it causes these open blood vessels to bleed and there is no way to stop them.
 Q. Would you say that it is accepted medical procedure in this area for a physician, after he has delivered a child, to see and ascertain that all of the placental tissue has been removed?
A. Yes.
. . . .
 Q. Do you feel that it's necessary that the placenta be removed in all cases after birth?
A. It's unquestionable.
Q. Unquestionable?
A. Right.
 Q. And if a doctor permitted placental tissue to remain in a woman after birth, that would not be within keeping of the standard medical procedures in this area?
A. That would not be in keeping with the standards.
. . . .
 Q. Doctor, as you mentioned, there are many circumstances during a delivery that do result in not all of the placenta being delivered, is that correct?
A. Yes.
 Q. It is not uncommon, is it, for portions of the placenta to be retained?
A. That can be quite exasperating sometimes.
 Q. So, the fact that placenta material remains in the uterus after delivery is not an indication of skill or lack of skill of the doctor, is it?
A. No, it's not.
 Q. Now, in this case there were 10 grams, I believe, of material removed from the uterus after the D C, is that correct?
A. Yes.
 Q. Would that be, in your opinion, an overly large amount of placenta material to be removed, or merely a moderate amount?
A. It's significant but not excessive.
 Q. Would the fact that 10 grams of placental material were removed from the uterus of Cheryl Hines indicate to you that the doctor who delivered the child had committed malpractice or malfeasance of any kind? *Page 307 
A. No.
In light of the foregoing testimony we cannot conclude that plaintiff has provided the necessary expertise required in a medical malpractice case. This Court said in Tant v. Women'sClinic, 382 So.2d 1120 (Ala. 1980):
 Appellee insists, and we agree, that professional malpractice cases, unlike negligence cases generally, require a unique quality of proof of the alleged wrongdoing. Only in the most extreme cases will the jury be permitted to find professional misconduct, resulting in injury within the doctor/patient relationship, absent expert testimony as to the standard of care which the doctor is alleged to have breached.
382 So.2d at 1121.
Furthermore, we cannot conclude that a physician would be liable just because another member of his profession would have treated the case a different way. Here, the defendant doctor proceeded to treat the condition on a conservative basis. At best, the testimony of Dr. Caffee only indicates that he would have performed the D C sooner. In Sims v. Callahan, 269 Ala. 216, 112 So.2d 776 (1959), this Court stated:
 The law does not permit a physician to be at the mercy of testimony of his expert competitors, whether they agree with him or not. In the case of Jackson v. Burton, 226 Ala. 483, 485, 147 So. 414, 416, this Court said: "The rule of law under such circumstances is that: `Where there are various recognized methods of treatment the physician is at liberty to follow the one he thinks best, and is not liable for malpractice because expert witnesses give their opinion that some other method would have been preferable.' Harzog on Med. Jur. § 183; 48 Corpus Juris. 1124, 1127; Carraway v. Graham, 218 Ala. 453, 118 So. 807; Barfield v. South Highlands Infirmary, 191 Ala. 553, 556 (27), 68 So. 30, Ann.Cas. 1916C, 1097."
269 Ala. at 225, 112 So.2d at 783.
The purpose of summary judgment is to eliminate useless and time-consuming trials where there is no genuine issue of material fact and resolution of the issue is narrowed to a question of law. Here, the physician, as well as the hospital, would have had to have breached the standard of care required by physicians and hospitals handling the same, or a similar, case. This, the plaintiff has failed to demonstrate, when Dr. Caffee's testimony is viewed as a whole. Therefore, summary judgment was appropriate. Liner v. Temple, 373 So.2d 638 (Ala. 1979).
There was no effort on the part of plaintiff to introduce a deposition or affidavit in opposition to the affidavit furnished by the defendant hospital. That affidavit, if uncontradicted, was sufficient to support summary judgment in the hospital's favor. Under such circumstances, the trial court is obligated to apply Rule 56 (e) strictly:
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
Based on the foregoing, the trial court did not err in granting summary judgment for both defendants. Therefore, its judgment is due to be, and it hereby is, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, ALMON, SHORES and BEATTY, JJ., concur. *Page 308