**REL: 10/17/2014**

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

OCTOBER TERM, 2014-2015

————————————————

1130902

————————————————

**Steven Alan Kraselsky, personal representative of the estate of Marcia Kraselsky, deceased**

v.

**David Calderwood, M.D., and Huntsville Clinic, Inc.**

**Appeal from Madison Circuit Court**
**(CV-12-900795)**

STUART, Justice.

Steven Alan Kraselsky ("Steven"), personal representative of the estate of his deceased mother Marcia Kraselsky ("Marcia"), sued David Calderwood, M.D., and Dr. Calderwood's

employer, Huntsville Clinic, Inc., in the Madison Circuit Court, alleging that Dr. Calderwood committed medical malpractice while treating Marcia following her admittance to Huntsville Hospital in July 2010 and that his alleged act of malpractice caused her already poor health to decline further and ultimately led to her death. The trial court entered a summary judgment in favor of Dr. Calderwood and Huntsville Clinic, and Steven appeals that judgment. We affirm.

I.

On July 1, 2010, Marcia, who was 80 years old at the time, fell and sustained a compression fracture to the T12 vertebra in her spine. She was admitted to Huntsville Hospital and, following some initial treatment, was thereafter discharged and sent to the local HealthSouth Rehabilitation Hospital for further treatment and therapy. However, sometime after being admitted to HealthSouth, she went into full cardiopulmonary arrest and had to be resuscitated. On July 12, 2010, Marcia was readmitted to Huntsville Hospital with extensive pulmonary emboli in both lungs, as well as excess fluid in the chest cavity and multiple rib fractures as a result of the resuscitation efforts. She was later determined

to have gastrointestinal bleeding and congestive heart failure as well.

At Huntsville Hospital, Marcia was treated by Dr. Calderwood, who had been her primary-care physician since 2006 and who had seen her approximately 27 times before this hospitalization, and by Dr. Misbahuddin Siddiqui, a pulmonary and critical-care specialist. Over the course of the next week, Marcia experienced pain in her lungs, ribs, back, and shoulder; however, her breathing did improve to some extent, although pain still made deep breathing difficult and she still experienced some shortness of breath. On July 19, 2010, Marcia was experiencing pain that was sufficiently severe that, Dr. Calderwood subsequently testified in a deposition, "she was begging for something for pain." Since being admitted on July 12, Marcia had been taking Norco, a pain medication that is a combination of hydrocodone and acetaminophen, orally and had been receiving morphine intravenously as well; however, Dr. Calderwood had discontinued the Norco on July 15, 2010, because Marcia was having difficulty swallowing.

During her previous consultations with Dr. Calderwood, and upon being admitted to Huntsville Hospital, Marcia had indicated that she was allergic to over 20 medications, including pain medications such as Darvon and Darvocet (propoxyphene), Motrin (ibuprofen), codeine, Dilaudid (hydromorphone), Vicodin (hydrocodone and acetaminophen), morphine, and Demerol (pethidine). Marcia in fact had been given a red arm band to wear while at Huntsville Hospital to alert hospital personnel that she had multiple allergies. However, in spite of her claimed allergies, Marcia had been given both morphine and Norco -- which contains the same active ingredients as Vicodin -- throughout her July 2010 hospitalizations without any apparent allergic reactions.

Accordingly, after visiting with Marcia on the morning of July 19, Dr. Calderwood ordered that she be given 6.25 milligrams of Demerol intravenously every six hours.[1] When a

---

[1]Dr. Calderwood has stated in an affidavit that he discussed Marcia's alleged Demerol allergy with her during that July 19 visit and that she explained that she got a headache when taking Demerol in the past. He concluded that the headache was no more than a side effect and not symptomatic of a true allergy. He also stated that Marcia consented to receiving Demerol at that time. Dr. Siddiqui testified that he had a similar conversation with Marcia about her claimed allergies when she was admitted and that he had also concluded that the headaches and nausea she associated

nurse subsequently reviewed the order, she recognized that Demerol was a listed allergen on Marcia's chart, and she accordingly contacted Dr. Calderwood to remind him of that fact and to verify his orders. Dr. Calderwood did in fact confirm the order, and hospital records associated with the order indicate that "M.D. is aware of allergy." The nurse administered Demerol to Marcia at approximately 5:20 p.m.

Prior to receiving the Demerol, Marcia's vital signs had been taken at 3:30 p.m. and were relatively normal -- a respiration rate of 20, pulse rate of 85, and oxygen-saturation rate of 96%. When her vital signs were taken again at approximately 8:00 p.m., her respiration rate had increased to 44, her pulse rate was up to 118, and her oxygen-saturation rate was only 86%. She was accordingly moved to the intensive-care unit, where she subsequently went into cardiopulmonary arrest and was resuscitated after her family rescinded a previous do-not-resuscitate order. The family later agreed to reinstate the do-not-resuscitate order, and Marcia died on July 22, 2010.

---

with Demerol and morphine were not true allergic reactions.

5

1130902

On June 15, 2012, Steven initiated a medical-malpractice action against Huntsville Hospital, Dr. Calderwood, and Huntsville Clinic, alleging that they had breached "the standard of care in causing or allowing [Demerol] to be given to [Marcia] in light of her condition and her sensitivity to this medication." Steven thereafter voluntarily dismissed his claim against Huntsville Hospital, and, following a period of discovery, Dr. Calderwood and Huntsville Clinic moved for a summary judgment in their favor, arguing that Steven had not identified substantial evidence indicating that Dr. Calderwood either breached the applicable standard of care or that any such breach proximately caused Marcia's death. Steven opposed the motion, and, on April 30, 2014, after conducting a hearing, the trial court granted Dr. Calderwood and Huntsville Clinic's motion and entered a summary judgment in their favor. On May 16, 2014, Steven filed his notice of appeal to this Court.

## II.

We review a summary judgment pursuant to the following standard:

> "This Court's review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co.,

1130902

886 So. 2d 72, 74 (Ala. 2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So. 2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So. 2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce 'substantial evidence' as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So. 2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12."

Dow v. Alabama Democratic Party, 897 So. 2d 1035, 1038-39 (Ala. 2004).

### III.

To prevail in a medical-malpractice action under the Alabama Medical Liability Act ("AMLA"), § 6-5-480 et seq. and § 6-5-541 et seq., Ala. Code 1975, a plaintiff must establish 1) the appropriate standard of care, 2) that the defendant health-care provider breached that standard of care, and 3) a proximate causal connection between the health-care provider's alleged breach and the identified injury. Morgan v. Publix Super Markets, Inc., 138 So. 3d 982, 986 (Ala. 2013). Thus, to survive a defendant health-care provider's summary-judgment

7

motion alleging the absence of substantial evidence that would establish any one of these three items, the plaintiff must submit -- or identify in the existing record -- substantial evidence that would in fact establish the challenged item or items. In the instant case, Dr. Calderwood and Huntsville Clinic alleged in their summary-judgment motion that there was not substantial evidence indicating (1) that Dr. Calderwood had breached the applicable standard of care or (2) that any such breach proximately caused Marcia's death. After reviewing the evidence submitted by Steven and the record as a whole, we agree that there is a lack of substantial evidence indicating that the alleged breach of the standard of care committed by Dr. Calderwood -- ordering Demerol to be administered to Marcia, who had listed it as a medication she was allergic to -- proximately caused her health to decline and, ultimately, her death.[2]

---

[2]Our holding that there is a lack of substantial evidence of proximate causation obviates the need to consider the sufficiency of the evidence on the issue whether Dr. Calderwood in fact breached the standard of care. Our proximate-causation analysis will assume that Steven did adduce substantial evidence of a breach of the standard of care; however, because it is ultimately unnecessary for us to make a conclusion in that regard, we express no opinion on that issue.

With regard to proximate causation in an AMLA case, this Court has stated that "the plaintiff must prove, through expert medical testimony, that the alleged negligence <u>probably</u> caused, rather than only <u>possibly</u> caused, the plaintiff's injury." <u>University of Alabama Health Servs. Found. v. Bush</u>, 638 So. 2d 794, 802 (Ala. 1994) (emphasis added). See also <u>Bradford v. McGee</u>, 534 So. 2d 1076, 1079 (Ala. 1988) ("[T]he plaintiff [in a medical-malpractice action] must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient."). In this case, Steven has not retained his own expert to testify regarding causation; rather, he argues that the deposition testimony of Dr. Siddiqui is sufficient to establish that Dr. Calderwood's order that Marcia be administered Demerol proximately caused the decline in her health leading to her death. When questioned by Steven's attorney during his deposition, Dr. Siddiqui testified as follows:

> "Q. Do you see a correlation between the timing of the Demerol and [Marcia's] breathing problem or her cardiopulmonary arrest?
>
> "A. Usually you would expect it to be much sooner because it was a quick onset drug and it was

9

given [in an] IV.  You usually do not see it that late.

"Q.  So you don't think there was any relationship?

"A.  Usually we see it much earlier.  I'm not sure that it -- I cannot say for certain that it did not, 100%, had no impact on her breathing whatsoever.  But it's just too late of a reaction.  Usually with IV administration we see [it] much sooner than what we did in this case.

"Q.  Is there anything else you can point to as the likely cause of her going into a code ... right after the Demerol had been administered.

"A.  In my judgment the patient was crucially ill throughout this hospitalization.  She came in with an arrest.  She came in with breathing difficulties.  And I actually had talked to the family and the patient upon admission given her presentation that the prognosis is going to be poor.  And I'm not sure that, you know, that -- how much Demerol contributed, but she was seriously ill with poor prognosis.

"....

"Q.  So with a patient having those comorbidities or these serious problems [pulmonary emboli and congestive heart failure], would the addition of the Demerol be a contributing factor in your opinion to her respiratory problems in all likelihood?

"....

"A.  Yes, certainly an excessive dose of any medication in her case would act as a suppressant.  But from what my understanding

is, ... she received a small dose and the reaction was much delayed.

"Q. Can you point us to any evidence that would lead you to conclude as her attending physician for the lung situation that she would have gone ahead and had this cardiopulmonary arrest on June 19th even if she hadn't been given the Demerol?

"A. Probably?

"Q. You think that probably would have happened at the same time without the Demerol?

"A. I cannot, to be honest, correlate the two. But it was high probability that she would have arrest again, and it was discussed with the family and her. ... I think, yes, there was a high probability it would have happened again.

"Q. Without the administration of any Demerol or an allergic medication for pain?

"A. Yes, sir.

"Q. So it sounds to me as though you are excluding any possible relationship of the administration of the 6.25 milligrams of Demerol and her arrest, respiratory problem?

"A. I am not. What I would say is that I -- again, I'm not -- I wasn't there when it happened. I did not examine her that night. But she had the high probability of cardiac arrest even without getting anything. Certainly any drug that you will administer that will have impact on slowing the patient's breathing down can also act as a factor. But she -- was that the primary thing that led to the arrest, in my judgment I do not think so.

11

1130902

"Q. If not primary, could it have played a causative role, though, to some degree, so that it adversely affected what was already in place?

"A. It is possible.

"Q. Possible or probable or certain?

"A. Possible.

"Q. Did you discuss that with the family after the Demerol questions they raised?

"A. I remember doing so, yes.

"Q. That there was a possible connection between the Demerol and her breathing problem that went on to the coma?

"A. Yes. They were very concerned about the Demerol. And, if I remember correctly, my statement was the same that, yes, she did receive it. She was ask -- she was hurting, she was asking for pain medicines. And I think I mentioned it to them -- I actually remember very clearly saying that I do not think that was the primary reason of her arrest.

"Q. What do you think was the primary reason for the arrest that went on to the coma and then her death?

"A. I think the amount of embolus burden, emboli burden that she had in her lungs probably has to do more with it. She had quite a bit of clot burden. All the emboli that she had, they were bilateral and they put a strain on her heart. And that's why she had gone into the initial arrest, primary arrest, when she came in."

1130902

Dr. Calderwood and Huntsville Clinic's attorney subsequently questioned Dr. Siddiqui as well:

"Q. I'm going to hand you [Marcia's] death certificate .... Is that the death certificate that you filled out?

"A. That's correct.

"....

"Q. And you indicated that the primary cause of death was what?

"A. Cardiopulmonary arrest.

"Q. Secondary to?

"A. Patient had pulmonary embolism and respiratory failure.

"Q. Did you list any other contributing causes to her death?

"A. Sepsis, [gastrointestinal] bleeding.

"Q. And do you feel that sepsis did contribute to cause her death?

"A. As a contributor, yes, to comorbidities.

"Q. You didn't list an allergic medication reaction as being in any way responsible for her death?

"A. I did not list that.

"....

"Q. And did you find any evidence in the hospital chart that she suffered a true anaphylactic or allergic reaction?

13

"A.  I did not find any such documentation.

"Q.  You feel that the cause of her respiratory decline that occurred was the embolus burden in her lungs which was placing a strain on her heart?

"A.  Primarily, yes."

Steven's attorney then had a few final questions for Dr. Siddiqui:

"Q.  Doctor, with the primary cause of the embolus burden placing a strain on her heart, a patient who is reportedly allergic to Demerol would be adversely affected by getting that on top of that burden, wouldn't she?

"A.  She can be.

"Q.  And wasn't she?  As you can see in this chart and putting that on top of that burden was a problem and sent her over the edge, so to speak, or into the arrest?

"A.  I can see that it can contribute.

"Q.  I mean, you're familiar with the term 'tipping point' aren't you?

"A.  Yes.

"Q.  I don't know that that's a medical term.  Is it a medical term?

"A.  No, sir.

"Q.  But when we look at the temporal nature of her situation in the hospital in July of 2010, the tipping point appears to have occurred after having been given Demerol, doesn't it?

"A. It appears so."

In his brief to this Court, Steven emphasizes the final excerpt of Dr. Siddiqui's testimony and argues that "Dr. Siddiqui's testimony that the Demerol could adversely affect [Marcia] and was the 'tipping point' that sent her over the edge to her arrest and death is substantial medical evidence on proximate cause which makes it a jury question." Steven's brief, at p. 38. We disagree with Steven's characterization of Dr. Siddiqui's testimony. Although keeping in mind that our standard of review requires us to review the evidence in the light most favorable to Steven, the nonmovant, Dow, 897 So. 2d at 1038-39, this excerpt does not indicate that Marcia's health deteriorated as a result of being given Demerol; rather, it indicates only that Marcia's health deteriorated after she was given Demerol. However, the sequence of events in this case is undisputed, and what Steven needs to defeat Dr. Calderwood and Huntsville Clinic's summary-judgment motion is not additional evidence supporting that time line but some evidence indicating that the administration of Demerol probably -- not possibly -- caused the decline in Marcia's health. Even if we were inclined to

interpret the discussion of the "tipping point" in the manner urged by Steven, it is clear from the entirety of Dr. Siddiqui's testimony that he did not consider Demerol to have proximately caused the decline in Marcia's health leading to her death. Indeed, when specifically asked if it was "possible," "probable," or "certain" that Demerol had a "causative role" in Marcia's death, Dr. Siddiqui was comfortable stating only that it was possible. In Giles v. Brookwood Health Services, Inc., 5 So. 3d 533, 550 (Ala. 2008), this Court cautioned against the practice of relying on isolated excerpts from deposition testimony to argue in favor of a proposition the testimony as a whole does not support, stating:

> "[T]he testimony of [the plaintiff's] medical expert is not sufficient to satisfy [the plaintiff's] burden of producing substantial evidence demonstrating the existence of a genuine issue of material fact as to her medical-malpractice claims .... Even if portions of her expert's testimony could be said to be sufficient to defeat a summary-judgment motion when viewed 'abstractly, independently, and separately from the balance of his testimony,' 'we are not to view testimony so abstractly.' Hines v. Armbrester, 477 So. 2d 302, 304 (Ala. 1985). See also Malone v. Daugherty, 453 So. 2d 721, 723-24 (Ala. 1984). Rather, as this Court stated in Hines:

16

"'We are to view the [expert] testimony as a whole, and, so viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to prove. In other words, can we say, considering the entire testimony of the plaintiff's expert, that an inference that the defendant doctor had acted contrary to recognized standards of professional care was created?'

"477 So. 2d at 304-05; see also Pruitt v. Zeiger, 590 So. 2d 236, 239 (Ala. 1991) (quoting Hines, 477 So. 2d at 304-05).

"Similarly, in Malone v. Daugherty, supra, another medical-malpractice case, we noted that a portion of the plaintiff's medical expert's testimony in that case,

"'when viewed abstractly, independently, and separately from the balance of his sworn statement, would appear sufficient to defeat the [defendant's] motion for summary judgment. But our review of the evidence cannot be so limited. The test is whether [the plaintiff's medical expert's] testimony, when viewed as a whole, was sufficient to create a reasonable inference of the fact Plaintiff sought to prove. That is to say, could a jury, as the finder of fact, reasonably infer from this medical expert's testimony, or any part thereof when viewed against the whole, that the defendant doctor had acted contrary to the recognized standards of professional care in the instant case.

"'Thus, in applying this test, we must examine the expert witness's testimony as a whole.'

17

1130902

"453 So. 2d at 723; see also Downey v. Mobile Infirmary Med. Ctr., 662 So. 2d 1152, 1154 (Ala. 1995) (noting that portions of a medical expert's testimony must be viewed in the context of the expert's testimony as a whole); Pendarvis v. Pennington, 521 So. 2d 969, 970 (Ala. 1988) ('[W]e are bound to consider the expert testimony as a whole.')."

It is clear, when examining Dr. Siddiqui's testimony as a whole, that he did not consider Demerol to have probably caused the decline in Marcia's health leading to her death. There is no other evidence in the record from which a jury could reasonably infer that fact either. Because such evidence is lacking, and because proximate causation is an essential element of Steven's medical-malpractice claim against Dr. Calderwood and Huntsville Clinic, their summary-judgment motion was due to be granted, and the trial court acted properly in doing so.

IV.

Steven sued Dr. Calderwood and Dr. Calderwood's employer, Huntsville Clinic, alleging that Marcia died as a result of Dr. Calderwood's order that Marcia be given Demerol in spite of the fact that Dr. Calderwood knew she had previously professed to having an allergy to Demerol. The trial court thereafter entered a summary judgment in favor of Dr.

18

1130902

Calderwood and Huntsville Clinic, and Steven appealed that judgment to this Court. Assuming, arguendo, that Dr. Calderwood breached the standard of care by ordering that Demerol be administered to Marcia, and, noting again that Dr. Calderwood strongly contests that fact, the summary judgment entered by the trial court is nevertheless due to be affirmed because there is no evidence in the record indicating that the administration of the Demerol to Marcia proximately caused the decline in her health leading to her death. The judgment of the trial court is accordingly hereby affirmed.

AFFIRMED.

Moore, C.J., and Parker, Shaw, and Wise, JJ., concur.

19