Rel: March 20, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

————————————————

### SC-2025-0517

————————————————

**Rhonda Kay Armour**

**v.**

**Southeast Alabama Medical Center**

**Appeal from Houston Circuit Court**
**(CV-13-900539)**

MENDHEIM, Justice.

Rhonda Kay Armour appeals from the Houston Circuit Court's summary judgment entered against her and in favor of Southeast Alabama Medical Center ("SEAMC") concerning Armour's negligence

claims in her medical-malpractice action. We affirm the circuit court's judgment.

## I. Facts

On November 13, 2011, Armour presented to SEAMC's emergency room complaining about "intractable lower back pain" and "episodes of right flank pain for a few days with some numbness and weakness in her left leg." Her pain was so severe that it had induced nausea and vomiting. Armour was initially seen by emergency-room physician Dr. James Burrows. Dr. Burrows reported that, upon examination, Armour had "radiated pain" in her back and "vertebral tenderness ... at the L3, L4, and L5" locations, that her "left lower extremity illicits [sic] pain at 45 degrees," but that her "[c]irculation is intact in all extremities." Because Armour had a history of back pain with sciatica, and at least some of her symptoms seemed to be consistent with that issue, Armour was admitted to the neurosurgical department under the care of Dr. Chris Hargett.[1]

---

[1]The record reflects that "sciatica" is lower back pain involving spinal nerves that radiates into the legs.

Lab results received by the neurosurgical department revealed that Armour had "profound anemia."[2] Dr. Hargett examined Armour and ordered an MRI (magnetic resonance imaging) scan which revealed evidence of a herniated disk. After reviewing the scan, Dr. Hargett and his neurology partner, Dr. Bruce Woodham, believed that the herniated disk did not warrant surgical intervention but, rather, outpatient epidural treatment. Dr. Hargett also ordered a CT (computed tomography) scan of Armour's chest, abdomen, and pelvis. The CT scan revealed no aneurysm or dissection in Armour's chest. However, it did show a "[n]onoccluding thrombus is present in the intraabdominal aorta."[3] Dr. Hargett also ordered a consultation with a hospitalist, Dr. Thomas J. Barkley, because of Armour's history of diabetes and the finding of anemia.

Dr. Barkley examined Armour the following day, November 14, 2011. Dr. Barkley noted Armour's complaints of pain in her right flank

---

[2]The record reflects that "anemia" is an iron deficiency in the blood.

[3]The record reflects that an "occlusion" is a blockage; with respect to vascular anatomy, it involves the blockage of arteries that interferes with blood circulation. The record reflects that a "thrombus" is a blood clot.

and numbness and weakness in her left leg. His initial impression was that the left-leg numbness could be due to "lumbar disk disease," but he noted that evaluation of that condition was ongoing with Dr. Hargett. Armour was kept at SEAMC for another day for further testing and evaluation.

On November 15, 2011, Armour's care was turned over to Dr. Barkley from Dr. Hargett for discharge once it had been determined that Armour's herniated disk did not warrant surgical treatment. In his discharge notes, Dr. Barkley observed that the CT scan showed that "[t]here was ... a small area of nonoccluding thrombus within the intraabdominal aorta, but no evidence of aneurysm or any other significant findings were noted there." He recommended a follow-up CT scan in four to six months. Dr. Barkley also noted that Armour "did have some numbness and cramping in her left leg that was thought possible due to the lumbar disc disease."

On November 28, 2011, Armour was readmitted to SEAMC's emergency room because, according to the discharge summary for that visit, she had "two weeks of ischemic symptoms in her left leg. She had

4

compartment syndrome and foot drop upon presentation."[4] Following a CT angiogram, it was determined that Armour had "an occlusion of her popliteal artery."[5] Aggressive efforts were taken to salvage Armour's left leg, but it was determined that "her ischemia was too advanced for functional limb salvage." Consequently, an above-the-knee amputation of Armour's left leg was performed.

On August 7, 2013, Armour commenced an action in the Houston Circuit Court against SEAMC and Dr. Barkley, alleging that SEAMC and Dr. Barkley had

> "negligently caused or negligently allowed [Armour's] left leg to suffer circulatory compromise that led to her loss of this leg. [SEAMC and Dr. Barkley] failed to properly evaluate [Armour's] leg and a large knot on her left calf during her hospitalization on November 13, 2011. [Armour's] CT scan at that prior hospitalization showed moderate aortic thrombus and she had left leg pain and numbness. [SEAMC and Dr. Barkley] negligently failed to properly and adequately evaluate [Armour] for left leg occlusion and failed to initiate anti-coagulant therapy which should have been done under the standard of care for this condition. ... As a proximate consequence of [SEAMC's and Dr. Barkley's] negligent acts and omissions, [Armour] went without necessary anti-coagulation and attention which resulted in severe ischemic

---

[4]The record reflects that "ischemia" is lack of oxygen and blood flow to organs or tissue.

[5]The record reflects that the popliteal artery is located behind the kneecap.

5

changes and necrosis in her left leg[6] between her admission on November 13, 2011, her discharge, and the readmission to the hospital; she suffered the amputation of her left leg; she was caused to suffer severe physical pain and mental anguish; she has required rehabilitative therapy and devices for her left leg; she has required extensive medical treatment and she has been permanently injured."

On September 11, 2013, SEAMC and Dr. Barkley filed separate answers to Armour's complaint in which they denied every material allegation and asserted various affirmative defenses.

On July 8, 2016, Armour filed a motion to voluntarily dismiss her claims against Dr. Barkley. The motion specified that her claims remained pending against SEAMC for Dr. Barkley's alleged negligence.[7] On the same date, the circuit court granted Armour's motion and dismissed Dr. Barkley as a defendant in the action.

On March 20, 2025, SEAMC filed a summary-judgment motion in which it contended that Armour had not produced substantial evidence demonstrating that Dr. Barkley's alleged breaches of the standard of care proximately caused Armour's leg amputation.

---

[6]The record reflects that "necrosis" is dead tissue that is caused by lack of oxygen.

[7]It is undisputed that Dr. Barkley was an employee of SEAMC at the time he treated Armour.

6

On May 9, 2025, Armour filed a response in opposition to SEAMC's summary-judgment motion in which she contended that the testimony from her medical expert, Dr. Susan Smith, sufficiently established that, if Dr. Barkley had properly evaluated and cared for Armour, the blood clot that led to her left-leg amputation would have been discovered in sufficient time for her leg to be saved.

On June 6, 2025, the circuit court granted SEAMC's summary-judgment motion, stating as its reason that "the court is of the opinion that [Armour] cannot prove causation." Armour filed a timely appeal.

## II. Standard of Review

"We review a summary judgment de novo. Potter v. First Real Estate Co., 844 So. 2d 540, 545 (Ala. 2002) (citing American Liberty Ins. Co. v. AmSouth Bank, 825 So. 2d 786 (Ala. 2002)).

"'"We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. 'Substantial evidence' is 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' In reviewing a summary judgment, we view the

evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw."'

"[Potter,] 844 So. 2d at 545 (quoting Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So. 2d 369, 372 (Ala. 2000)) (citations omitted).

"Summary judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P."

Hooper v. Columbus Reg'l Healthcare Sys., Inc., 956 So. 2d 1135, 1139 (Ala. 2006).

## III. Analysis

"'To prove liability in a medical malpractice case, the plaintiff must prove (1) the appropriate standard of care, (2) the doctor's deviation from that standard, and (3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff.' Looney v. Davis, 721 So. 2d 152, 157 (Ala. 1998). See Complete Family Care v. Sprinkle, 638 So. 2d 774 (Ala. 1994); Bradford v. McGee, 534 So. 2d 1076 (Ala. 1988); and § 6-5-484, Ala. Code 1975. To defeat a properly supported motion for a summary judgment on a medical-malpractice claim, the nonmovant ordinarily must present testimony from a 'similarly situated' medical expert. Levesque v. Regional Med. Ctr. Bd., 612 So. 2d 445, 449 (Ala. 1993)."

Hauseman v. Univ. of Alabama Health Servs. Found., 793 So. 2d 730, 734

(Ala. 2000).

Armour's argument is straightforward: she contends that Dr. Smith, a hospitalist, presented clear testimony that Dr. Barkley breached the standard of care for a hospitalist in two ways and that Dr. Barkley's breaches of the standard of care probably led to Armour's leg needing to be amputated. SEAMC's counterargument is also straightforward: it contends that Dr. Smith's causation testimony is contingent upon what treatment a vascular surgeon would have provided to Armour given her condition during her visit on November 13 through November 15, 2011, and that Armour did not provide any expert testimony from a vascular surgeon concerning what treatment Armour should have received. On the other hand, SEAMC notes, it did provide testimony from a vascular surgeon, Dr. Randall Nichols, who testified that he would not have taken any action for treatment of Armour's condition beyond ordering a follow-up appointment in a few months for another CT scan.

Before we detail the testimony from Dr. Smith that is relied upon by each party, it is helpful to understand each party's theory of the case. Armour asserts, based on Dr. Smith's testimony, that, when Armour presented to SEAMC on November 13, 2011, she had a partial occlusion of her popliteal artery that Dr. Barkley failed to diagnose and treat and

that, by the time Armour presented herself to SEAMC on November 28, 2011, she had a complete occlusion of the popliteal artery that caused necrosis in her leg tissue. SEAMC asserts, based on testimony from Dr. Barkley and Dr. Nichols, that there was no evidence of any occlusion present in Armour's vascular system on November 13, 2011, and that the occluding thrombus in Armour's popliteal artery that was present when Armour presented to SEAMC on November 28, 2011, was an acute -- meaning sudden and complete -- blood clot that developed shortly before Armour returned to SEAMC.

Armour supports her contention that she presented substantial evidence of causation by pointing to a colloquy between Armour's counsel and Dr. Smith at the end of Dr. Smith's deposition:

> "Q. Based upon your reviews of all of that material, and upon your education and your training and your experience as a board-certified internal medicine doctor, do you have an opinion, Dr. Smith, as to whether or not to a reasonable degree of medical certainty -- strike that. As to whether or not Dr. Barkley breached the standard of care in his care and treatment of Ms. Armour during the admission of November 13, 2011?
>
> "....
>
> "A. It is my belief that he did.

"....

"Q. Tell me, without taking too long to tell me, in what way he violated the standard of care, in your opinion.

"....

"A. His first violation of standard of care was failure to recognize and appropriately manage a mural aortic thrombus[8] irrespective of any other symptoms or irrespective of anything else going on with the patient. He could have stopped right there. With doing nothing else wrong, he did wrong by failing to treat that. He should have stopped right there, gotten another radiograph, recognized the potential for embolization, said to himself, oh, my goodness, what is this. I need to do something about this, and done the right thing. That was breach number one. That was the first missed opportunity, in my opinion, to save this leg.

"....

"Q. All right.

"A. Breach number two, upon seeing the CT scan, he failed to recognize the embolization potential of it with respect to the symptoms with which this patient presented. He simply didn't put it together because he simply didn't understand what he was looking at.

"....

---

[8]Dr. Smith's reference to "a mural aortic thrombus," or MAT, is another way of labeling the "nonoccluding thrombus within the intraabdominal aorta" that was observed in the CT scan and noted by Dr. Barkley in his discharge note.

11

"Q. When she finally presented to the hospital on November 13 -- and my memory is she was admitted from the 13th to the 15th; is that correct?

"A. That's correct.

"Q. In that admission were the symptoms identified in the record and in the testimony you read consistent with a partial occlusion in the popliteal artery?

"....

"A. Yes.

"....

"Q. Do you have an opinion, Doctor, as to whether or not to a reasonable degree of medical certainty the breach of the standard of care, or breaches of the standard of care which you've just identified by Dr. Barkley probably led to or approximately contributed to the amputation of Ms. Armour's leg?

"....

"A. High level of probability.

"Q. More likely than not?

"....

"A. Much more likely."

12

Based on the foregoing testimony, Armour argues that "Dr. Smith clearly testified that [Dr. Barkley's] negligence and his breaches of the standard of care more likely than not caused or contributed to the injury suffered by [Armour]." Armour's brief, p. 15. She emphasizes the facts that "we view the evidence at the summary-judgment stage in a light most favorable to [Armour] as the nonmovant for summary judgment," Collins v. Herring Chiropractic Ctr., LLC, 237 So. 3d 867, 871 (Ala. 2017), and that "'[t]he question of proximate causation is ordinarily one for the jury, if reasonable inferences from the evidence support the plaintiff's theory.'" Jostens, Inc. v. Herff Jones, LLC, 308 So. 3d 10, 26 (Ala. 2020) (quoting Garner v. Covington Cnty., 624 So. 2d 1346, 1349 (Ala. 1993)).

SEAMC supports its contention that Armour failed to present substantial evidence of causation by pointing to multiple portions of Dr. Smith's deposition testimony in which Dr. Smith faults Dr. Barkley for failing to consult a vascular surgeon to determine how to properly care for Armour.

> "Q. [SEAMC's counsel:] Have you ever had any experience with treating patients with mural aortic plaque thrombus?
>
> "A. Yes.

"Q. What is your experience in that regard.

"A. I have taken care of patients with that diagnosis, managed their hospital care, followed them up outpatient.

"Q. How are those conditions treated?

"A. Most of them are treated with anticoagulation followed initial -- the vast majority of them are treated by evaluation with a CTA [computed tomography angiography] to evaluate the entire aortic tree, following which the decision is made to -- all of this is done under the direction of a vascular surgeon or an interventional radiologist.

"If the aorta is clean, if there's no associated aneurysm, if there's no severe atherosclerotic disease, they may just choose to anticoagulate so that they mitigate the stroke risk. If it's a mobile or a pedunculated lesion, they may actually go in there and choose to do an embolectomy and actually get that out of there because those are such bad actors. So [it] depends.

"Q. So it's either perhaps anticoagulation or surgical removal; is that right?

"A. It's almost always anticoagulation and possibly surgical removal.

"Q. Ms. Armour was not a candidate for any [anti]coagulation, was she?

"A. It would have been a risk/benefit calculation at the time. Given the risk for embolization in that diagnosis, and the fact that she had a chronic, stable iron deficiency anemia, that would have been one of those calculations where you

14

discussed it with a gastroenterologist, took her off her anti-inflammatories, put her on GI prophylaxis, and said, you need this blood thinner, so we're going to go forward with that.

"<u>I can't say that's where they would have landed. That's a conversation that would have been had</u>.

"Q. But you're not critical of the fact that the conversation may have landed on, we can't anticoagulate her because of her anemia and the unknown source of her anemia, correct?

"A. In the setting of -- if you see the thrombus and you determine that there's actively -- there's active embolization going on, then you override the anemia in order to treat, and you would have gone ahead with anticoagulation. So there's more chance than not that she would have been anticoagulated despite the anemia. It's not an absolute contraindication. It's a relative one.

"Q. Well, is it your opinion based on, just simply based on the presence of a mural aortic plaque that she should have been anticoagulated, that Ms. Armour should have been anticoagulated in the setting of her having anemia which the cause was unknown?

"A. <u>I would not have made that decision on the spot</u>. I would have gotten further information about the anemia. First of all, I would do what they did, make sure there's no active bleeding, and then I would have gotten further information on the thrombus, and <u>then I would have had a conversation with my gastroenterologist and my vascular surgeon, who's looking at that thrombus, to say, okay, what's the risk/benefit calculus here</u>.

15

"Q. So you would rely on the vascular surgeon and the gastroenterologist in making that determination?

"A. I would have to have both of those pieces of information. The only thing that I can tell you that I absolutely would not do -- there's a variety of options here. The only thing that is not an option is to do nothing.

"Q. And the options are either anticoagulation or surgery?

"A. The options are get a higher level of expertise and get their opinion and let --

"Q. I'm talking about options of treatment.

"A. -- and let that vascular surgeon decide how best to treat it. The options are to proceed with evaluating it myself and then decide if I'm going to call a vascular surgeon. I wouldn't do that option. I would want my gastroenterologist's opinion. I would want to see what the endoscopy showed."

(Emphasis added.)

"Q. [SEAMC's counsel:] What do you believe the standard of care required Dr. Barkley to do based upon her presentation and the finding of --

A. So the first --

"Q. Let me please finish. And the finding of mural aortic thrombus on the CT scan?

"A. Correct question. <u>The first thing he should have done the minute he saw that is order a CTA and call a vascular surgeon</u>.

"Q. Okay. So you think he should have ordered a CT angiogram to see the condition of the aorta and the extent of the thrombus?

"A. Yes, sir.

"Q. <u>And he should have called a vascular surgeon to decide what should be done with it</u>?

"A. <u>Yes, sir</u>.

"....

"Q. We're beyond the CT. <u>You've told me now that you believe he should have ordered a CTA and called a vascular surgeon to</u> --

"A. That's when he saw the MAT [mural aortic thrombus]. That is specific to the MAT. It doesn't matter what that MAT was doing downstream. I'm just talking about the MAT itself. If that MAT was showing no evidence of peripheral embolization, that's what he should have done.

"Then he should have realized, oh, my goodness, I have an MAT, and I have a patient with flank pain, and I have a funny-looking kidney, and I have a patient who's on a continuous morphine pump for pain that's not responding and has severe pain in her leg. I would have then expanded my differential [diagnosis]. If I hadn't put it on there before, I would sure as hell have put it on there then. My differential

[diagnosis] just got blown up. My differential [diagnosis] had to include this embolization to the leg.

"Q. Okay. And that was stated in the first sentence, that you believe it should have been in the differential [diagnosis], correct?

"A. There are two concerns in that sentence nested within one sentence.

"Q. That he should have evaluated the MAT, and that he should have, in your opinion, had vascular insufficiency with a possibility of embolization in his differential diagnosis?

"A. Yes, number one and number two.

"Q. That's your opinion, correct?

"A. Yes.

"Q. And as a result, you believe he should have ordered a CTA and called a vascular surgeon to make the decision on what to do?

"A. That's what the standard of care dictates."

(Emphasis added.)

"Q. [SEAMC's counsel:] I mean, I just need to know your opinion, and I understand it to be that as a result of the finding on the CT scan, you believe Dr. Barkley should have further evaluated the MAT by ordering a CTA, and by getting vascular surgery involved to decide what to do; and secondly, you think it should have caused him and anybody else who saw it to think that the differential diagnosis should now

18

include the possibility of embolization and vascular insufficiency?

"A. <u>Absolutely, that's what I think</u>. ..."

(Emphasis added.)

"Q. [SEAMC's counsel:] Then you say, with all the examination findings available to Dr. Barkley, he was negligent in failing to evaluate the potential embolization of the aortic thrombus. We've covered that, correct?

"A. Correct.

"Further, it is my opinion that had Ms. Armour been properly evaluated and worked up, the peripheral thrombus would have been detected, and more likely than not the amputation of Ms. Armour's left leg above the knee would have been avoided.

"Q. <u>Tell me what you think a CTA and involvement -- and consult with a vascular surgeon would have led to</u>.

"A. There's almost -- there's a high, high, high probability that this was an actively embolizing lesion. You can see it on the kidney. You would most likely, high, high, high probability have seen embolization to the lower extremity. The CTA would have been performed with what's called a runoff. This is a patient with leg pain.

"<u>There's not a vascular surgeon in the world that wouldn't have gone straight to CTA with iliac runoff so you can see all the lower extremity vessels and see what they look like because the things that you worry about when you see an MAT, you worry about stroke, and you worry about lower</u>

extremity embolization. Those things must be excluded, and that's what would have been determined."

(Emphasis added.)

SEAMC contends that Dr. Smith's testimony lacked a vital causal link between Dr. Barkley's alleged breaches of the standard of care and the treatment Armour would have received from a vascular surgeon. As SEAMC explains:

> "Dr. Smith's causation testimony rests upon an assumption that had a vascular surgeon been consulted, said vascular surgeon would have undertaken some intervention that would have prevented Armour's eventual injury. Dr. Smith is not a vascular surgeon and does not speculate as to the manner and timing of the hypothetical intervention that the consulting vascular surgeon would employ to prevent the injury. ...
>
> "It is well settled that '[a]n expert witness's opinion that is conclusory, speculative, and without a proper evidentiary foundation cannot create a genuine issue of material fact.' Becton v. Rhone-Poulenc, Inc., 706 So. 2d 1134, 1141-42 (Ala. 1997). As Dr. Smith is not a vascular surgeon ..., she does not and cannot testify to what a vascular surgeon would have done had said vascular surgeon been contacted. Additionally, it is of no import that Dr. Smith testified to the probability that Dr. Barkley's alleged breach of the standard of care caused Armour injuries because that probability determination depends upon a conclusion she is unqualified to make (i.e., what a vascular surgeon phoned by Dr. Barkley on November 15, 2011, would have done)."

SEAMC's brief, pp. 21-22.

20

Armour's only response to the foregoing argument from SEAMC is to point back to the portion of Dr. Smith's deposition testimony that did not directly reference the need for a vascular surgeon and concluded that Dr. Barkley's alleged breaches of the standard of care led to the amputation of Armour's left leg. Based on that portion of Dr. Smith's testimony, Armour argues that, "[w]hile Dr. Smith did discuss what role a vascular surgeon may have played, Dr. Smith's opinions do not rely upon nor are they premised upon what a vascular surgeon may have done." Armour's reply brief, p. 6.

However, this Court has repeatedly stressed the need to view a witness's testimony as a whole.

> "'"Our cases make it abundantly clear ... that a portion of the testimony of the plaintiff's expert cannot be viewed 'abstractly, independently, and separately from the balance of his testimony.' Hines v. Armbrester, 477 So. 2d 302, 304 (Ala. 1985). See, e.g., Downey v. Mobile Infirmary Med. Ctr., 662 So. 2d 1152, 1154 (Ala. 1995) (noting that '[t]his Court has consistently held that the testimony of an expert witness in a medical malpractice case must be viewed as a whole, and that a portion of it should not be viewed abstractly, independently, or separately from the balance of the expert's testimony').
>
> "'"....
>
> "'"'"We are to view the [expert] testimony as a whole, and, so viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to

prove."' Giles v. Brookwood Health Servs., Inc., 5 So. 3d 533, 550 (Ala. 2008) (quoting Hines, 477 So. 2d at 304-05)."'"

Spencer v. Remillard, 325 So. 3d 747, 770 (Ala. 2020) (quoting Hrynkiw v. Trammell, 96 So. 3d 794, 800-01 (Ala. 2012), quoting in turn Graves v. Brookwood Health Servs., Inc., 43 So. 3d 1218, 1228 (Ala. 2009)).

Viewing Dr. Smith's testimony as a whole, it is clear that her opinion of Dr. Barkley's breaches of the standard of care included a failure to involve a vascular surgeon to determine how to treat the alleged partial occlusion in Armour's popliteal artery. Dr. Smith then speculated that, in all probability, a vascular surgeon would have applied treatment while Armour was at SEAMC between November 13 and November 15, 2011, that would have resolved what Dr. Smith believed to be a partial occlusion in Armour's popliteal artery. In other words, as SEAMC has noted, Dr. Smith's testimony as to causation depended on speculation regarding treatment Armour would have received from a medical specialist that is outside Dr. Smith's area of expertise. Armour did not submit any testimony from a vascular surgeon to close this gap in her evidence of medical causation. As we noted at the outset of this analysis, this Court has explained that a plaintiff in a medical-malpractice action "ordinarily must present expert testimony from a 'similarly situated

22

health-care provider' as to ... 'a proximate causal connection between the [defendant's] act or omission constituting the breach and the injury sustained by the plaintiff.'" <u>Lyons v. Walker Reg'l Med. Ctr.</u>, 791 So. 2d 937, 942 (Ala. 2000) (quoting <u>Pruitt v. Zeiger</u>, 590 So. 2d 236, 238 (Ala. 1991), quoting in turn <u>Bradford v. McGee</u>, 534 So. 2d 1076, 1079 (Ala. 1988)).

Moreover, SEAMC did provide testimony from a vascular surgeon, Dr. Nichols, that refuted Dr. Smith's speculation. Dr. Nichols's deposition testimony included the following colloquy:

"Q. [SEAMC's counsel:] In 2011, at Southeast Alabama Medical Center, if a physician ordered a vascular surgery consult, is it likely that you would have been one of the surgeons consulted?

"A. Yes, sir

"Q. <u>Had you been consulted during Ms. Armour's hospitalization on November 13 through 15 to address what you described as 'plaque' in the aorta, which is also described as a 'thrombus,' is there anything you would have done to address that issue</u>?

"A. <u>No, sir</u>.

"Q. <u>What would you have done</u>?

"A. <u>Follow up with another scan, probably, in a few months</u>.

23

"Q. Based on your review of the records, did you see any clinical signs or symptoms during Ms. Armour's hospitalization on November 13 through 15, that indicated a partial or total occlusion of the popliteal artery?

"A. No, sir.

"Q. Based on your review of the records from Ms. Armour's hospitalization on November 13 through 15, were there any clinical signs or symptoms that would have caused you, as a vascular surgeon, to order a Doppler ultrasound or Ankle Brachial Index test?

"A. No, sir.

"Q. Is it your opinion that when Ms. Armour was discharged on November 15th from Southeast Alabama Medical Center, she did not have a partial or total occlusion of her popliteal artery?

"A. Yes.

"Q. Does the consistency of the clot that was ultimately removed from Ms. Armour during her November 28th hospitalization, does the consistency of that clot indicate to you that this was an acute occlusion, rather than an occlusion that started as a partial occlusion and became a complete occlusion over a period of approximately two weeks?

"A. Yes, sir.

"Q. Is it your opinion that it was an acute occlusion?

"A. Acute occlusion, yes, sir.

24

"Q. In your opinion, as a vascular surgeon, was there any way for any healthcare provider that treated Ms. Armour during her hospitalization on November 13 through 15 to predict that she would develop an occlusion of the popliteal artery approximately two weeks later?

"A. No, sir."

(Emphasis added.)

In sum, Dr. Nichols testified that he would not have ordered any different treatment for Armour based on the finding of a mural aortic thrombus than the treatment that Dr. Barkley actually provided to Armour. Thus, even if it is assumed that Dr. Barkley breached the standard of care by failing to order a CT angiogram and by failing to consult a vascular surgeon to determine a treatment regimen for Armour's condition, the only competent evidence submitted by either party dictates that those breaches of the standard of care would not have affected the outcome in this case. In other words, Armour did not establish a causal link between Dr. Barkley's alleged breaches of the standard of care and the injury she sustained. Therefore, Armour did not present substantial evidence to support her negligence claims against SEAMC.

## IV. Conclusion

A plaintiff has the burden of establishing "'a proximate causal connection between the [health-care provider's] act or omission constituting the breach and the injury sustained by the plaintiff.'" Rivard v. University of Alabama Health Servs. Found., P.C., 835 So. 2d 987, 988 (Ala. 2002) (citation omitted). The circuit court correctly concluded that Armour had failed to meet that burden in response to SEAMC's summary-judgment motion. Therefore, the circuit court's summary judgment in favor of SEAMC is affirmed.

AFFIRMED.

Stewart, C.J., and Shaw, Bryan, and McCool, JJ., concur.